Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 1 of 69

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

MARJORIE KOHLBERG, individually and as Administrator of the Estate of Edmund Kohlberg, DAVID EIJADI, individually and as Trustee of the David Azziz Eijadi and Barbara Anne Eijadi Revocable Trust Dated May 27, 2015, THOMAS MCDOUGALL, individually and as Trustee of the Thomas G. McDougall Trust dated November 17, 2005, PETER D. OTTAVIO, individually and as Trustee of the Peter D. Ottavio Revocable Living Trust dated February 19, 2016, MELISSA LASSOR, MARY LOU JURKOWSKI, JASON STEINBOCK, and BETSY SEARS, all on behalf of Themselves and all others similarly situated,

                        Plaintiffs,

    -against-


TOM BIRDSEY, LONG POINT CAPITAL, INC., LONG POINT CAPITAL FUND II. L.P., LONG POINT CAPITAL PARTNERS II, L.P., LONG POINT CAPITAL FUND III, L.P., LONG POINT CAPITAL PARTNERS III, L.P., IRA STARR, NORMAN SCHERR, ERIC VON STROH, and GREATBANC TRUST COMPANY,

                        Defendants.

---

Index No. _____

Date Filed: April 1, 2022


**SUMMONS**

---

TO THE ABOVE NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the undersigned within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded herein.

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 2 of 69

Plaintiff designates New York County as the place of trial. Venue is based upon the county in which one or more of the defendants reside.

Dated:   April 1, 2022                    Respectfully submitted,

PLAINTIFFS KOHLBERG, EIJADI, McDOUGALL, LASSOR, OTTAVIO, JURKOWSKI, and STEINBOCK,

By their attorneys,

/s/Phillip Rakhunov
Barry S. Pollack
Phillip Rakhunov
POLLACK SOLOMON DUFFY LLP
485 Madison Avenue, Suite 1301
New York, NY 10022
212-493-3100 (Tel)
617-960-0490 (Fax)
prakhunov@psdfirm.com
bpollack@psdfirm.com

PLAINTIFF SEARS,

By her attorneys,

/s/Matthew C. Lenahan
Matthew C. Lenahan
RUPP BAASE PFALZGRAF
CUNNINGHAM, LLC
16 West Main Street
Rochester, NY  14614
585-381-3400 (Tel)
lenahan@ruppbaase.com

Case 1:23-cv-01437-AMN-DJS   Document 1-1   Filed 04/13/22   Page 3 of 69

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| MARJORIE KOHLBERG, individually and as Administrator of the Estate of Edmund Kohlberg, DAVID EIJADI, individually and as Trustee of the David Azziz Eijadi and Barbara Anne Eijadi Revocable Trust Dated May 27, 2015, THOMAS MCDOUGALL, individually and as Trustee of the Thomas G. McDougall Trust dated November 17, 2005, PETER D. OTTAVIO, individually and as Trustee of the Peter D. Ottavio Revocable Living Trust dated February 19, 2016, MELISSA LASSOR, MARY LOU JURKOWSKI, JASON STEINBOCK, and BETSY SEARS, all on behalf of Themselves and all others similarly situated, | Index No. _____ <br><br> **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| -against- | |
| TOM BIRDSEY, LONG POINT CAPITAL, INC., LONG POINT  CAPITAL FUND II. L.P., LONG POINT CAPITAL PARTNERS II, L.P., LONG POINT CAPITAL FUND III, L.P., LONG POINT CAPITAL PARTNERS III, L.P., IRA STARR, NORMAN SCHERR, ERIC VON STROH, and GREATBANC TRUST COMPANY, | |
| Defendants. | |

Plaintiffs Marjorie Kohlberg, individually and as Administrator of the Estate of Edmund

Kohlberg, David Eijadi, individually and as Trustee of The David Azziz Eijadi and Barbara

Anne Eijadi Revocable Trust Dated May 27, 2015, Thomas McDougall, individually and as

Trustee of the Thomas G. McDougall Trust dated November 17, 2005, Peter D. Ottavio,

individually and as Trustee of The Peter D. Ottavio Revocable Living Trust dated February 19,

2016, Melissa Lassor, Mary Lou Jurkowski, Jason Steinbock and Betsy Sears, all on behalf of themselves and all others similarly situated, as and for their Complaint against Defendants Tom Birdsey, Long Point Capital, Inc., Long Point Capital Fund II, L.P., Long Point Capital Partners II, L.P., Long Point Capital Fund III, L.P., Long Point Capital Partners III, L.P., Ira Starr, Norman Scherr, Eric Von Stroh, and GreatBanc Trust Company, allege as follows:

### Statement of the Case

1.      Defendant Long Point Capital, Inc. ("Long Point") has developed a complex fraudulent scheme for certain of its private equity investments, by which Long Point has convinced unwitting employees who own equity to sell their stock to an Employee Stock Ownership Plan ("ESOP"). In the process, Long Point receives cash based on an inflated valuation of the stock while those employees receive uncollectible notes, leaving the portfolio company saddled with overwhelming debt and debt servicing obligations.

2.      Through this scheme, Long Point has been able to initiate exit transactions that provide it with a disparate benefit by diverting excessive cash to its funds or other affiliates. This scheme served Long Point rather than maximize value for all stockholders to whom Long Point and such affiliates owed fiduciary duties as a controlling stockholder group. Through Long Point's ESOP scheme, minority stockholders and portfolio company employees are left holding subordinated and virtually worthless notes owed by over-leveraged payors that lack the ability to satisfy the overwhelming debt obligations incurred to generate the cash that Long Point takes.

3.      Here, in or about 2011, Long Point, through its affiliates Long Point Capital Fund II, L.P. and Long Point Capital Partners II, L.P. ("Long Point Fund II"), invested approximately $9 million into EYP Holdings, Inc. and EYP Group Holdings, Inc. (collectively, "EYP"), and certain affiliates, that operate as a national architecture and engineering firm based out of New

2

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 5 of 69

York. Approximately five years later, Long Point initiated its ESOP exit strategy. In connection

with Long Point's scheme, on or about June 28, 2016, Long Point's affiliates, including Long

Point Capital Fund III, L.P. and Long Point Capital Partners III, L.P. ("Long Point Fund III")

received disparate benefits as compared to Plaintiffs and others similarly situated to them. This

disparity included more than $40 million in cash to Long Point, an approximately 500% return

on the original investment, while Plaintiffs and other sellers received unreliable notes from

payors saddled with too much other debt to service those notes.

4.      Long Point accomplished its ESOP scheme at EYP through its power to appoint

and control three of the five members of EYP's board of directors, namely Defendants Ira Starr,

Norman Scherr and Eric Von Stroh, all of whom were Principals, Partners and/or Managing

Directors of Long Point, and by combining with Defendant Tom Birdsey, a co-founder of EYP

who remained a member of its board of directors and its Chief Executive Officer ("CEO") at the

pertinent time, David Watkins, also a member of EYP's board of directors, and John Kempf,

EYP's Chief Financial Officer ("CFO"). Through the conflicted board of directors and officers,

Long Point pushed through the creation of an ESOP to become the buyer of all of EYP's stock at

an unfairly-inflated price, with Long Point receiving more than $40 million in cash. Long Point

generated this cash for itself by saddling EYP and its affiliates with senior secured debt.

5.      EYP would not have qualified for such debt, but for financial information and

valuations that Long Point, Starr, and Birdsey knowingly inflated.

6.      To help structure and employ the ESOP transaction and scheme, Long Point used

financially-interdependent advisors with which it does repeat business. Long Point's business

records reflect that it had used Defendant GreatBanc Trust Company ("GreatBanc") as an ESOP

trustee for a majority of ESOP exit transactions that Long Point has promoted as its experience in

Case 1:23-cv-01437-AMN-DJS   Document 1-1   Filed 04/13/22   Page 6 of 69

the area of ESOP exit transactions. Besides GreatBanc, Long Point regularly used Wilmington

Trust Co. ("Wilmington Trust") as an ESOP trustee. At the relevant times, both GreatBanc and

Wilmington Trust had repeated private and public complaints against them for cooperating with

and ensuring a maximum and inflated value for private equity sellers such as Long Point's

affiliates and other controlling stockholder groups. As a common scheme, these ESOP trustees

allow the portfolio companies and ESOPs to incur excessive debt to outside lenders in order to

provide a controlling stockholder group with cash, while providing subordinated junk notes to

the minority-stockholder victims. As a result of this scheme here, Long Point's affiliates received

disparate benefits consisting of much more cash than appropriate as a controlling stockholder

group, while leaving minority stockholders with subordinated, worthless or near worthless notes

owed by a portfolio company forced to service massive debt. Many of these types of transactions

involving Long Point or GreatBanc have resulted in insolvent portfolio companies.

       7.     The United States Department of Labor (the "DOL") has forced both of Long

Point's regular ESOP trustee counterparts, GreatBanc and Wilmington Trust, to pay collectively

more than $90 million dollars in damages and fines for participating in schemes by which ESOPs

overpay the controlling stockholders that selected them. GreatBanc's and Wilmington's

reputations for corruption were known to and enjoyed by Long Point prior to the execution of its

scheme here. Their reputations should have been a reason to avoid them, but instead served as a

(if not the) reason Long Point has selected these entities to serve as ESOP trustees for its scheme.

       8.     Based on their pattern of conduct together, Long Point selected a trustee that

would compromise its fiduciary duties to serve Long Point's interest. According to Long Point's

own business records, despite being on opposite sides of the implementation of the ESOP

scheme, Long Point and GreatBanc shared the same outside counsel for the transaction.

4

According to certain of Long Point's business records, K&L Gates provided a joint legal representation of Long Point and GreatBanc in connection with the ESOP scheme at EYP. This conflicted representation facilitated Long Point's exit with an approximately 500% return on investment after only about five years, while Plaintiffs and similarly situated minority stockholders received uncollectible notes.

9.      Long Point has employed its ESOP scheme because of several ways in which an ESOP facilitates its exploitation of minority stockholders. First, key minority stockholders are often approaching retirement, making them somewhat less concerned about the long-term prospects of the business. Second, most employees becoming part of an ESOP will not invest significant money for personal counsel to protect their interests, instead relying on company management or counsel for the company. Third, certain advisors in the ESOP industry that offer trustee services, such as GreatBanc and Wilmington Trust, view DOL fines as a mere cost of doing business while they maintain intimate and financially-interdependent relationships with certain private equity funds and managers, such as Long Point and its affiliates, that are willing to commit substantial fee arrangements for trustees to consummate ESOP exit transactions.

10.      Here, Long Point struck gold in terms of vulnerable victims and management ripe for corruption. As described in more detail below, Defendant Birdsey, who was CEO and Chairman of EYP, not only appeared ready for retirement, but also faced a criminal investigation into his role with a key client, SUNY Polytechnic Institute. Birdsey sat on the board of a SUNY Polytechnic Institute affiliate. Criminal charges against others later indicated that he had improperly caused EYP to enter into certain lease transactions and other arrangements in exchange for large and highly-profitable no-bid or rigged-bid contracts with SUNY Polytechnic Institute awarded in EYP's favor. Long Point not only tolerated conduct by Birdsey that should

have resulted in his removal as the CEO, but actually issued him substantial stock options, valued in excess of $5 million, for diverting his loyalty exclusively to Long Point. In connection with the ESOP scheme, Long Point even arranged to divert $2.7 million for the unique benefit of Birdsey by classifying a payment for him as an estimated tax payment, thereby treating him differently and better than other stockholders, none of whom received such options and associated multi-million dollar cash payments for their benefit.

11.     Leading up to the implementation of the ESOP scheme, unknown to minority stockholders of EYP, Birdsey and the other Defendants knew that business EYP received from SUNY Polytechnic Institute had been illegitimately obtained and was the subject of a joint state and federal criminal investigation. Notwithstanding the ongoing investigation, the Defendants improperly included revenue from such business in existing data and projections used for establishing stock prices for the ESOP scheme that would pay off Long Point and its affiliates. Defendants' knowledge of the criminal investigation created a sense of urgency among them, motivating them to implement their fraudulent ESOP scheme quickly, before the problems underlying the business from SUNY Polytechnic would become public or known to Plaintiffs and EYP's other minority stockholders.  Despite Long Point's duties to disclose as a controlling stockholder, and Starr's and Birdsey's duties to disclose as directors, each of them withheld these material facts from, and made materially misleading statements about valuations to, Plaintiffs and other minority stockholders of EYP.

12.     Among other ways Defendants inflated the valuations, in or about March 2016, Defendants Long Point, Starr, and Birdsey, along with Watkins, participated in meetings with an outside professional in connection with valuations for the sale of stock to the ESOP, falsely touting contractual rights to $40 million in revenue related to the SUNY Polytechnic relationship

despite the absence of a valid contract or even the completion of a proper bid process. Defendants knew that this $40 million in revenue should not have been relied on for any fair and proper valuation at the time. Nevertheless, Defendants included this revenue in the valuation to inflate falsely and materially the price at which the stock would sell to the ESOP, while misrepresenting the fairness of this valuation to Plaintiffs and other minority stockholders to induce them into selling their stock to the ESOP. Defendants knew that they needed to overinflate the stock price to ensure that Long Point could obtain a 500% return on its investment. Had Defendants not used overinflated revenue and profit data or had they adequately disclosed the false inflation of revenue and profits, the minority stockholders would have known that the cash to Long Point would make their notes worthless or near worthless at the time the ESOP transaction closed and would have enforced Long Point's and Birdsey's fiduciary obligations, arising in part from the special benefits that they received as direct participants in these transactions, to engage in an entirely fair process at a fair price.

13.     Long Point and Birdsey collaborated to ensure reliance on inflated financial information and valuations, and overstated EYP's revenue and/or profits. Long Point and Birdsey knew that EYP's then-CFO, John Kempf, was loyal to them and would not question Long Point's and Birdsey's knowingly inflated financials. Therefore, they appointed him as "Sellers' Representative" in the transaction, knowing that Kempf would sign off on the transaction on behalf of the stockholders without representing and protecting the stockholders' interests. At the closing of the ESOP scheme, $1.7 million in funds flowed to Sellers' Representatives. Based on his treatment as a member of Long Point's inner circle, Kempf acted as an agent of Defendants and facilitated their fraud.

14.     The last management check on Long Point and Birdsey at EYP, Ed Kohlberg,

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 10 of 69

became seriously ill by mid-2015 and died later that year. Shortly before Ed Kohlberg died, in or about September 2015, Birdsey arranged for EYP to purchase Ed Kohlberg's stock at a valuation at least 40% lower than what Long Point and Birdsey would use just a few months later for the ESOP exit transaction. As Ed Kohlberg's illness made him less involved in EYP's business, Birdsey's and Long Point's ESOP scheme came to fruition.

15.     Upon Ed Kohlberg's death, a vacant position on the EYP board of directors arose. Long Point and Birdsey schemed to fill this seat with Watkins, an EYP employee who has committed loyalty to Birdsey and has done as instructed rather than serving the best interest of EYP or its stockholders. Watkins became privy to financial information from which he knew or should have known that Long Point grossly overvalued EYP, and that EYP would not be able to pay all its debts post-ESOP transaction, particularly those debts that would be paid to the majority of stockholders that would hold notes subordinated to his. After receiving preferential notes, Watkins purposefully concealed material financial information from EYP stockholders, including those stockholders who were formerly employed by WHR Architects, Inc., an architecture firm that EYP bought prior to the ESOP transaction, and encouraged other stockholders to approve the transaction.

16.     The ESOP scheme offered such undue benefits to Long Point that it caused the conflicted board of directors to reject summarily an opportunity to sell EYP in a strategic transaction that offered better value for other constituents, such as a sale to a publicly-traded architecture and engineering firm, Stantec, Inc. ("Stantec"). Prior to purchasing EYP, Stantec would have completed due diligence, including investigating EYP's financial statements and contracts. During this due diligence, a potential strategic buyer such as Stantec would have reasonably been expected to discover Birdsey's illicit relationship with SUNY Polytechnic and

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 11 of 69

the ongoing investigation.

17.     Therefore, in or about November 2015, the EYP board of directors (through Birdsey) canceled a follow-up meeting with Stantec leadership, in order to conceal his relationship with SUNY Polytechnic, remain in control of EYP, and help Long Point pursue exclusively the ESOP scheme, for the benefit of Defendants, at the expense of EYP's minority stockholders. Despite Long Point's duties to disclose as a controlling stockholder, and Starr's and Birdsey's, and their fellow Long Point-appointed directors', duties to disclose as directors, each of them withheld the developed interest that Stantec had in an acquisition of EYP and the board's summary rejection of Stantec.

18.     The Stantec transaction would have offered synergies valued, from the perspective of minority stockholders, at tens of millions of dollars in greater value for minority stockholders than that offered by an ESOP, which here, as is customary for ESOPs, did not provide actual synergy value.

19.     Unlike a newly-formed ESOP, Stantec, as an experienced suitor, would not have participated in such an obvious breach of fiduciary duties by Long Point in diverting to itself such a disparate benefit, including nearly all of the cash from a controller-initiated transaction, to Long Point and its affiliates. Stantec would also have expected an entirely fair process and price for EYP's minority stockholders. A fair process and price would have prevented Long Point from exploiting minority stockholders the way that it did. Therefore, Defendants did not pursue advanced discussions with Stantec and avoided discussions with other strategic suitors. Long Point, Starr, Birdsey and other directors did not inform minority stockholders of material aspects of these opportunities or of their plan to prioritize the ESOP transaction to avoid discovery of the issues with SUNY Polytechnic.

9

Case 1:23-cv-01437-AMN-DJS   Document 1-1   Filed 04/13/22   Page 12 of 69

20.     As a result of its fraudulent scheme, Long Point, its affiliates, its appointed

directors, and Birdsey diverted more than $40 million in cash to Long Point's affiliates, while

minority stockholders received three categories of notes: (1) "redemption" notes for those

already retired or in the process of retiring, generally carrying a maturity date in 2021;

(2) "Group 1" notes generally for those planning an imminent retirement, and generally carrying

a maturity date in 2051; and (3) further subordinated "Group 2" notes for then-existing

employees who did not have imminent retirement plans, also carrying a maturity date of 2051.

Since that time, EYP has failed to make any of the scheduled pre-maturity installment or interest

payments on any of these categories of notes given to minority stockholders.

21.     Since the completion of the ESOP transaction, Birdsey, Long Point's Starr

(jointly serving as an EYP board member and Long Point managing partner), and GreatBanc

have fraudulently concealed, and conspired to fraudulently conceal, their wrongdoing. As

described in detail below, Birdsey, Long Point, and Starr retained board positions at EYP that

allowed them to conceal their fraud by altering messaging to the Plaintiffs and others similarly

situated and dissuading them from enforcing rights.

22.     Through at least in or about July 2018, on behalf of themselves, each other and

Long Point, Birdsey, and Starr touted, in a materially false way, that the ESOP *enhanced* EYP's

ability to satisfy loan covenants and resulting payments. They falsely claimed that business

results created temporary cash flow problems that would have disallowed such payments even in

the absence of the ESOP transaction. During that time, they did not inform Plaintiffs and the

other noteholders that they knew EYP's revenue and profits were over-inflated such that EYP

would not be able to satisfy loan covenants. Not until 2020 did Plaintiffs receive sufficient

information from EYP to discover its causes of action.

10

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 13 of 69

23.     In reality, but unknown to the Plaintiffs and those similarly situated, the debt obligations incurred by the ESOP transaction had paralyzed EYP's and its affiliates' ability to satisfy covenants in favor of Key Bank, EYP's senior secured lender, thereby preventing payments on the subordinated notes held by Plaintiffs. Shortly after the close of the ESOP transaction, EYP was already in violation of its loan covenants and had to amend credit facilities and agree to onerous covenants. Birdsey and Long Point (through Starr) were aware of the amendments to the credit facilities and defaults on onerous covenants, but did not disclose the material details about the covenants to Plaintiffs and others similarly situated such that they could have understood the problems with the ESOP from the start.

24.     It was not until July 10, 2018, just two days before the conviction of SUNY Polytechnic's President and CEO, that Birdsey and Long Point (through Starr) provided Plaintiffs with any details about the covenants or other information to understand that EYP was insolvent as a result of massive debt and associated debt servicing costs.

25.     Birdsey, Starr and Watkins remained on EYP's board of directors until at least in or around February 2021. From 2016 to 2021, they continued to falsely and misleadingly deflect blame onto others in a manner designed to delay and prevent noteholders from discovering Defendants' fraudulent ESOP scheme, thereby deterring them from enforcing their rights.

26.     In or about the fall of 2019, EYP employed outside counsel to conduct an internal investigation into restructuring needs and Long Point's conduct. Only as a result of these investigative and restructuring efforts in late 2019 and early 2020 did minority stockholders learn the scope of Birdsey's and Long Point's scheme and their culpability in connection with it.

27.     Birdsey, Long Point, Long Point Fund II, Long Point Fund III, Starr, Scherr, Von Stroh, and GreatBanc are liable to Plaintiffs for at least $44 million improperly paid and directed

11

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 14 of 69

to Long Point's affiliates, $2.7 million paid for the benefit of Birdsey, and the opportunities lost by not consummating a sale to Stantec or other market-value strategic transaction in connection with a fair process and price for minority stockholders.

28.    The claims in this action are based on the limited universe of information made available to date. Plaintiffs have not had access to most of the communications among the Defendants and with outside financial advisors about the ESOP, the valuations underlying it, and other materials relevant to this action. Defendants' scheme is at least in substantial part a self-concealing fraud. As described below, Long Point even promoted ESOPs generally in the marketplace as a way to limit the information shared with minority stockholders. In other words, Long Point and other Defendants valued their ability to preclude Plaintiffs and those similarly situated to them from learning all the information that would reveal the full scope of Defendants' scheme.

### Jurisdiction and Venue

29.    This Court has jurisdiction over the Defendants because all of them, with the exception of Scherr, reside in New York. All Defendants, including Scherr, carried out their scheme in and in a manner directed at New York, where EYP and Long Point were both headquartered at all relevant times. The amount of damages sought herein exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

30.    Venue is proper in the County of New York, where a substantial portion of the events giving rise to this action occurred, where multiple Defendants have locations and therefore reside and regularly do business, and which Plaintiffs hereby designate as venue for this action, pursuant to CPLR §§ 503 and 509.

12

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 15 of 69

**Parties**

31.    Plaintiff Marjorie Kohlberg is a resident of Virginia and the administrator of the estate of her late husband, Ed Kohlberg. As a result of the Defendants' ESOP scheme, Ms. Kohlberg holds, in her individual capacity and as the Administrator of the Estate of Ed Kohlberg, an amended note dated June 28, 2016 in the outstanding amount of $3,330,377.21 plus interest.

32.    Plaintiff David Eijadi is a resident of Minnesota and Trustee of the David Azziz Eijadi and Barbara Anne Eijadi Revocable Trust dated May 27, 2015. As a result of the Defendants' ESOP scheme, Mr. Eijadi holds redemption notes dated June 28, 2016 in the outstanding amount of $985,475.86 plus interest.

33.    Plaintiff Thomas McDougall is a resident of Minnesota and a Trustee of the Thomas G. McDougall Trust dated November 17, 2005. As a result of the Defendants' ESOP scheme, Mr. McDougall holds a redemption note initially issued in 2015 in the amount of $248,638.67 of which approximately $165,759 remains outstanding, and a Group 1 note dated June 28, 2016 in the outstanding amount of $5,870,735.98, plus interest.

34.    Plaintiff Peter D. Ottavio is a resident of New York and a Trustee of the Peter D. Ottavio Revocable Living Trust dated February 19, 2016. As a result of the Defendants' ESOP scheme, Mr. Ottavio holds a Group 1 note dated June 28, 2016, in the outstanding amount of $4,790,584.37 plus interest.

35.    Plaintiff Melissa Lassor is a resident of South Carolina. As a result of the Defendants' ESOP scheme, Ms. Lassor holds a Group 1 note dated June 28, 2016 in the outstanding amount of $1,615,667.30 plus interest, which was amended to confirm a five-year maturity date in approximately 2021 because of an agreement to treat her as a redemption noteholder.

13

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 16 of 69

36.     Plaintiff Mary Lou Jurkowski is a resident of North Carolina. As a result of the Defendants' ESOP scheme, Ms. Jurkowksi holds redemption notes with five-year maturity terms, one initially issued on March 18, 2016 and amended on June 28, 2016 in the amount of $166,952.01, and another dated June 10, 2016 in the amount of $164,343.15, with an outstanding balance of approximately $275,644.51 plus interest.

37.     Plaintiff Jason Steinbock is a resident of Iowa. As a result of the Defendants' ESOP scheme, Mr. Steinbock holds a Group 2 note dated June 28, 2016 in the outstanding amount of $951,172.96 plus interest, with a maturity date in or about 2051.

38.     Plaintiff Sears is a resident of South Carolina. As a result of the Defendants' ESOP scheme, Ms. Sears holds a Group 2 note, dated December 30, 2016 in the outstanding amount of $760,148.06, plus interest.

39.     Defendant Birdsey is a resident of New York who served as CEO of EYP at relevant times through the implementation of the ESOP scheme, and as a director of EYP through the commencement and pursuit of this action. For several decades, Birdsey managed EYP or its affiliates with Ed Kohlberg. Birdsey served as Chairman and CEO of EYP from 2005 until on or about December 31, 2018. At all relevant times, Birdsey had fiduciary duties of obedience, honesty and loyalty. As a fiduciary who substantially assisted in initiating and causing the implementation of the ESOP scheme, and received a disparate benefit from the transactions, his fiduciaries duties required him to disclose to Plaintiffs and other minority stockholders and noteholders all material facts related to the transactions, in which he participated in his capacity as a director, stockholder and noteholder.

40.     Defendant Long Point is a corporation formed under the laws of Delaware with its principal place of business in New York. At all relevant times, Long Point has managed the

14

INDEX NO. 651555/2022
RECEIVED NYSCEF: 04/01/2022
Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 17 of 69

private equity funds that are Defendants in this action and owed fiduciary duties to all Plaintiffs

as part of the controlling stockholder group. At all relevant times, Long Point had fiduciary

duties of honesty and loyalty as the ultimate controller of the controlling stockholder group. As a

result of being part of the controlling stockholder group that initiated the ESOP scheme and

received disparate benefits from the transactions at issue, including more than $40 million in

cash, Long Point's fiduciary duties required it to disclose to Plaintiffs and other minority

stockholders and noteholders all material facts related to transactions in which it participated as a

stockholder or noteholder and to conduct those transactions through an entirely fair process and

at a fair price.

41.      Defendants Long Point Fund II and Long Point Fund III are limited partnerships

formed under the laws of Delaware with their principal places of business in New York and,

upon information and belief, each consisting of a general partner that resides in New York. Long

Point Fund II and Long Point Fund III comprised, along with Long Point and Starr, the

controlling stockholder group of EYP through the implementation of the ESOP scheme. At the

time of its 2011 investment in EYP, Long Point used Long Point Fund II to make the investment.

On or about November 25, 2014, Long Point announced the launch of Long Point Fund III.

When it completed the ESOP scheme, Long Point directed EYP to forward cash proceeds to

Long Point Fund III. At all relevant times, Long Point Fund II and Long Point Fund III had

fiduciary duties of obedience, honesty and loyalty. As a result of being part of the controlling

stockholder group that initiated the ESOP scheme and received disparate benefits from the

transactions at issue, including more than $40 million in cash, Long Point Fund II and Long

Point Fund III owed fiduciary duties that required them to disclose to Plaintiffs and other

minority stockholders and noteholders all material facts related to transactions in which it

15

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 18 of 69

participated as a stockholder or noteholder and to conduct those transactions through an entirely

fair process and at a fair price.

42.     Defendant Starr is a resident of New York, the co-founder and a Managing

Director of Long Point, and a Long Point-appointed director of EYP since Long Point first

invested in it in 2011. At all relevant times, Starr had fiduciary duties of obedience, honesty and

loyalty.  As a result of being part of the controlling stockholder group that initiated the ESOP

scheme and received disparate benefits from the transactions at issue, including more than

$40 million in cash, Starr owed fiduciary duties that required him to disclose to Plaintiffs and

other minority stockholders and noteholders all material facts related to transactions in which it

participated as a stockholder or noteholder and to conduct those transactions through an entirely

fair process and at a fair price.

43.     Defendant Scherr is a resident of Michigan, held out by Long Point as one of its

principals, and a Long Point-appointed director of EYP through the implementation of the ESOP

scheme. At all relevant times, Scherr had fiduciary duties of obedience, honesty and loyalty.  As

a result of being part of the controlling stockholder group that initiated the ESOP scheme and

received disparate benefits from the transactions at issue, including more than $40 million in

cash, Scherr owed fiduciary duties that required him to disclose to Plaintiffs and other minority

stockholders and noteholders all material facts related to transactions in which it participated as a

stockholder or noteholder and to conduct those transactions through an entirely fair process and

at a fair price.

44.     Defendant Von Stroh is a resident of New York, held out by Long Point as a

managing partner, and a Long Point-appointed director of EYP through the implementation of

the ESOP scheme. At all relevant times, Von Stroh had fiduciary duties of obedience, honesty

Case 1:23-cv-01437-AMN-DJS   Document 1-1   Filed 04/13/22   Page 19 of 69

and loyalty. As a result of being part of the controlling stockholder group that initiated the ESOP

scheme and received disparate benefits from the transactions at issue, including more than

$40 million in cash, Von Stroh owed fiduciary duties required it to disclose to Plaintiffs and

other minority stockholders and noteholders all material facts related to transactions in which it

participated as a stockholder or noteholder and to conduct those transactions through an entirely

fair process and at a fair price.

45.     Defendant GreatBanc is a resident of and maintains an office at 45 Rockefeller

Plaza, in New York, New York. GreatBanc regularly does business in New York, has multiple

financial and close business relationships with Long Point and, at relevant times, prepared to

serve and then served as ESOP trustee within the ESOP scheme.

46.     EYP Holdings, Inc. and EYP Group Holdings, Inc. are corporations formed under

the laws of Delaware with principal places of business in New York. At the relevant times, Long

Point dominated and controlled EYP, disregarding corporate formalities and withholding

adequate capitalization from them and their affiliates, to complete the Defendants' fraudulent

plans to sell holdings in EYP Group Holdings, Inc. Through various affiliates and subsidiaries,

EYP provides architecture and engineering services. Plaintiff Kohlberg's late husband and all

other Plaintiffs worked at EYP, had held minority ownership interests in EYP and were, at

relevant times, owed fiduciary duties by Birdsey, Long Point, Long Point Fund II, Long Point

Fund III, Starr, Scherr, and Von Stroh.

47.     EYP has repeatedly informed all Plaintiffs that their notes are uncollectible, with

EYP insolvent and in need of a restructuring. Indeed, EYP has described itself as insolvent as the

result of the massive debt imposed on it at the time of the ESOP scheme. Each of the Plaintiffs

holding redemption and Group 1 notes expected to enjoy retirement with his or her earned nest

17

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 20 of 69

egg, and the others holding Group 2 notes expected substantial funds for their future. Instead, the Defendants' scheme to defraud them has caused them substantial stress and financial pressure. In total, this group of named Plaintiffs alone is owed approximately $20 million with interest. As a group and individually, they are qualified to represent a class of noteholders, as described in more detail below, in claims against the Defendants for their fraudulent ESOP scheme.

**Factual Background**

*Long Point Targets EYP*

48.     Founded in 1972 in New York, EYP provides architecture and engineering services. EYP has expanded beyond New York, growing at its peak to more than 600 employees across 14 offices throughout the country.

49.     Prior to Long Point's investment in 2011, EYP had been consistently ranked as one of the nation's top architecture and engineering firms. Just prior to the investment, EYP had been named fifteenth overall and second in the education sector on Engineering News Record's list of the Top 100 Green Design Firms. Long Point viewed EYP as one of the world's leading architecture and engineering firms.

50.     To induce EYP to allow Long Point to invest in EYP, Long Point proposed to EYP a plan for synergies, such as those benefitting from horizontal and vertical services in planning, design, program and cost management and consulting, separately or as an integrated package. Long Point held out these synergies with their other portfolio companies, including CHA and Cumming Group, and later Woolpert, an international architecture, engineering and geospatial firm. Long Point had invested in CHA through Long Point Fund II in or about February 2009.

51.     On or about August 10, 2011, Long Point closed and announced its investment in

EYP. Long Point invested approximately $9 million in exchange for an approximately 30% interest in EYP and the right to appoint three of five members on the board of directors. As a result of the transaction, Long Point controlled the board of EYP.

***The 2015-2016 Architecture and Engineering Marketplace***

52.     In 2015 and 2016, the architecture and engineering industry was ripe for strategic transactions. For 2015, as an example, Morrissey Goodale tracked a record 234 sales of domestic architecture and engineering firms. This flurry of activity reflected a greater than 5% increase over the flurry of 222 domestic deals completed in 2014. These transactions included AECOM's $6 billion acquisition of the engineering and design firm URS Corporation. In June of 2016 alone (when Mr. Birdsey and Long Point Capital were consummating their ESOP scheme), the industry experienced significant merger activity. For example, MorrisSwitzer Environments for Health, Ascension Group Architects, and daSilva Architects merged into Environments for Health Architecture. Shortly thereafter, Mason & Hanger, the Day & Zimmermann Company in design, architecture and engineering solutions, acquired the architecture and engineering firm Hankins & Anderson. Later that year, EwingCole, the architecture, engineering, and interior design firm, acquired BBH Design, a planning, design, and design research services firm.

***Strategic Transaction Opportunities with Stantec Abandoned for the ESOP Scheme***

53.     By in or about February 2015, EYP engaged Houlihan Lokey ("Houlihan") as a financial advisor to analyze the potential sale of EYP. Houlihan expressed strong optimism about the climate for a transaction and EYP's candidacy as a target.

54.     Based on its experience in the industry, Houlihan stressed to EYP and Long Point the availability and value of synergies in an exit transaction, recommending a build out of the synergy story.

55.     Houlihan provided expert guidance on EYP's unique appeal within its synergy story, including EYP's exceptional industry-wide recognition with a diverse customer and end-market base; an outstanding and sustainable financial profile with a highly-scalable platform; an industry thought leadership with unparalleled barriers to entry; and significant growth opportunities with a proven track record. Houlihan described the benefits and logistics of a sales process that would generate bidding activities among multiple suitors.

56.     By on or about February 12, 2015, Houlihan had identified a short list of strategic potential suitors offering adequate synergies for an acquisition of EYP. This list included Stantec, a publicly-traded competitor, as a strategic potential suitor offering adequate synergies for an acquisition of EYP. Houlihan identified Stantec as having an equity-value to EBITDA ratio reflecting an 11.8x multiplier.

57.     EYP had regularly used a consultant named Terry Johnson of Modicum, LLC, for assistance with acquisitions. Johnson proceeded into discussions with Stantec about an acquisition of EYP. By in or about September 2015, Johnson had engaged in substantial discussions with Stantec's Vice President, Acquisitions and Strategic Planning.

58.     Also by late September 2015, Stantec offered an opportunity for EYP to enjoy greater value in a strategic acquisition with synergies, significantly beyond the value that an ESOP offered, particularly from the perspective of EYP's minority stockholders. Upon information and belief, Stantec made known that it was prepared to acquire EYP, which would have generated a value much greater for minority stockholders than what could be obtained through the ESOP scheme that Defendants ultimately implemented for their own benefit.

59.     By in or about October 2015, Stantec sought to arrange for its President/CEO and Executive Vice President to meet with EYP's leadership.

60.     On or about October 22, 2015, Stantec made arrangements to meet with Johnson

and at least Birdsey from EYP on November 10, 2015. Upon information and belief, Stantec was

eager to complete an acquisition of EYP at fair market value that would take into consideration

the synergies between the parties.

61.     On or about October 23, 2015, Birdsey provided written responses to an email to

him from an EYP employee named Charles Kirby, copying other employees, John Kempf, Leila

Kamal, John Tobin, John Baxter, Elissa Kellett and Paul King, in which Birdsey promoted the

alternative of an ESOP to certain members of senior management.

62.     After the November 10, 2015 follow-up meeting about the Stantec acquisition of

EYP had been scheduled, Birdsey canceled the meeting and terminated those discussions without

a valid explanation, in furtherance of plans with Long Point, Starr, Scherr, and Von Stroh to

implement an ESOP for the Defendants' benefit.

63.     On or about November 17, 2015, Long Point, Starr and Birdsey sought

affirmative commitments from senior management to the use of an ESOP to buy EYP.

64.      In response to requests for board minutes concerning the potential acquisition of

EYP by Stantec or other suitors, EYP has indicated in substance that no pre-ESOP board minutes

from 2015 or early 2016 exist, if they ever did.

65.     At about the same time that Birdsey canceled the follow-up meeting with

Stantec's leaders, Birdsey, on behalf of EYP and Long Point, facilitated the purchase by EYP of

stock held by the Estate of Ed Kohlberg, who passed away on or about October 17, 2015. Ed

Kohlberg had managed EYP with Birdsey for decades. By in or about September 2015, Ed

Kohlberg had become extremely sick and would soon die. At that time, Birdsey negotiated the

purchase of Ed Kohlberg's stock at a valuation per share of approximately $2,700, which was

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 24 of 69

less than 55% of the valuation Birdsey and Long Point would enjoy just several months later

when they implemented their ESOP scheme at a per share price of approximately $5,100.

66.     Despite Long Point's duties to disclose as a controlling stockholder, and Starr's,

Scherr's, Von Stroh's, and Birdsey's duties to disclose as directors, each of them withheld from

minority stockholders the material existence of a developed interest that Stantec had in an

acquisition of EYP and the board's summary rejection of Stantec.

67.     With Ed Kohlberg gone, Birdsey and Long Point were left unchecked in their

efforts to exploit minority stockholders, which they decided to accomplish through an ESOP that

they would create to serve as a buyer of EYP stock.

### Long Point's Use of GreatBanc as ESOP Trustee

68.     Long Point has held out its experience in creating ESOP exit transactions through

the regular use of GreatBanc as an ESOP trustee.

69.     Besides GreatBanc, Long Point has relied on Wilmington Trust multiple times as

an ESOP trustee.

70.     These two entities have had reputations for serving the interests of the private

equity funds or controlling stockholders that bring them in as trustees, rather than the interests of

the ESOP beneficiaries to which they actually owe fiduciary duties. The DOL has taken

significant action against both GreatBanc and Wilmington Trust, imposing collectively more

than $90 million in damages and fines against them for similar schemes that harmed minority

stockholders and employees in favor of cash to controlling stockholders.

71.     Shortly before Long Point brought GreatBanc in as ESOP trustee at EYP, on

June 2, 2014, the DOL reached a settlement agreement with GreatBanc imposing a long list of

strict rules with which GreatBanc must comply whenever serving as an ESOP trustee. This

document is entitled, "AGREEMENT CONCERNING FIDUCIARY ENGAGEMENTS AND

PROCESS REQUIREMENTS FOR EMPLOYER STOCK TRANSACTIONS."

72.    These restrictions placed on GreatBanc by the DOL focused on, among other

things, the qualifications of any financial advisor performing a valuation in connection with an

ESOP transaction, avoiding a financial advisor with potential conflicts of interest, and record-

keeping requirements. Among other things, GreatBanc agreed in pertinent part that it would:

- prudently determine that its reliance on the valuation advisor's advice is reasonable before entering into any transaction in reliance on the advice;

- not use a valuation advisor for a transaction that has previously performed work – including but not limited to a "preliminary valuation" – for or on behalf of any counterparty to the ESOP involved in the transaction;

- obtain written confirmation from the valuation advisor selected that none of the list of potential conflicts exist;

- prepare a written analysis that included:

    1. The reason for selecting the particular valuation advisor;
    2. A list of all the valuation advisors that the Trustee considered;
    3. A discussion of the qualifications of the valuation advisors that the Trustee considered;
    4. A list of references checked and discussion of the references' views on the valuation advisors;
    5. A statement whether the valuation advisor was the subject of prior criminal or civil proceedings; and
    6. A full explanation of the bases for concluding that the Trustee's selection of the valuation advisor was prudent.

- oversee the valuation advisor in part by requiring it to document the individuals responsible for providing any projections reflected in the valuation report, and as to those individuals, conduct reasonable inquiry as to (a) whether those individuals have or reasonably may be determined to have any conflicts of interest in regard to the ESOP (including but not limited to any interest in the purchase or sale of the employer securities being considered); and (b) whether those individuals serve as agents or employees of persons with such conflicts, and the precise nature of any such conflicts; and (c) record in writing how the Trustee and the valuation advisor considered such conflicts in determining the value of employer securities;

- critically assess the reasonableness of any projections (particularly management

23

projections), and if the valuation report does not document in writing the reasonableness of such projections to the Trustee's satisfaction, the Trustee will prepare supplemental documentation explaining why and to what extent the projections are or are not reasonable;

- preserve documents for at least six years;

- not cause an ESOP to purchase employer securities for more than their fair market value or sell employer securities for less than their fair market value. (The DOL states that the principal amount of the debt financing the transaction, irrespective of the interest rate, cannot exceed the securities' fair market value.)

- not cause an ESOP to engage in a leveraged stock purchase transaction in which the principal amount of the debt financing the transaction exceeds the fair market value of the stock acquired with that debt, irrespective of the interest rate or other terms of the debt used to finance the transaction;

- consider whether it is appropriate to request a claw-back arrangement or other purchase price adjustment(s) to protect the ESOP against the possibility of adverse consequences in the event of significant corporate events or changed circumstances. (The Trustee will document in writing its consideration of the appropriateness of a claw-back or other purchase price adjustment(s)); and,

- The Trustee may, consistent with its fiduciary responsibilities under ERISA, employ, or delegate fiduciary authority to, qualified professionals to aid the Trustee in the exercise of its powers, duties, and responsibilities *as long as it is prudent to do so*.

73.    In connection with the Defendants' ESOP scheme at EYP, GreatBanc violated the letter and spirit of the rules to which it had agreed with the DOL. Instead of fulfilling a role as a fiduciary of members of the ESOP, GreatBanc took actions that benefitted Long Point to the detriment of Plaintiffs and other similarly situated participants of the ESOP. GreatBanc's lack of independence from Long Point is evidenced by the fact that it improperly shared outside counsel, K&L Gates, for the implementation of the ESOP scheme at EYP, which was not and could not have been perceived as prudent for GreatBanc to do as the ESOP trustee. This joint representation deprived the ESOP and other participants in the transaction of certain key legal advice and safeguards independent of Long Point's interests.

74.    Defendants defrauded and breached duties to Plaintiffs and those similarly

24

situated in part by falsely inflating valuations and causing GreatBanc to breach the terms of the DOL-imposed terms and its fiduciary duties. In addition to flaws and/or violations of the DOL-imposed terms that appear in the valuation report that it obtained, GreatBanc essentially abandoned its valuation advisor's report during negotiations. Unknown to Plaintiffs and other minority stockholders of EYP, Birdsey, Long Point, Starr, Von Stroh, and Scherr had knowingly and improperly used or relied on inflated revenue and profit data, excessive multiples of EBIDTA for an ESOP transaction and/or entities or transactions as comparables that improperly took synergies into consideration, which should not have been factored into a valuation for an ESOP transaction. Instead of questioning the higher valuation during negotiations, GreatBanc, as part of its scheme with the other Defendants, ignored its valuation advisor's report and its fiduciary duties to members of the ESOP and agreed to purchase shares of EYP based on the other Defendants' inflated stock price.

75.     By accepting Long Point's and Birdsey's inflated stock price, GreatBanc breached the DOL-imposed terms and its fiduciary duties. GreatBanc, as ESOP trustee, agreed that the ESOP would purchase Long Point's and stockholders' outstanding stock in EYP at an over-inflated value. GreatBanc, as ESOP trustee, agreed that the ESOP would fund this purchase by issuing notes to the stockholders and taking out a substantial loan. The result of this leveraged stock transaction was that the principal amount of the debt financing the transaction exceeded the fair market value of the stock acquired with that debt. Yet GreatBanc did not meaningfully consider, let alone demand, as it was required to do, a claw-back arrangement or other purchase price adjustment(s) to protect the ESOP against the possibility of adverse consequences in the event of significant corporate events or changed circumstances.

76.     GreatBanc abandoned its duty to serve as fiduciary of the ESOP by buying the

outstanding stock at a highly-inflated stock price. Not only did stockholders receive worthless notes, but EYP was left over-leveraged and insolvent. What is more, the Plaintiffs and others similarly situated who were still employed at EYP received ESOP shares that were worth significantly less than the price GreatBanc paid for the shares.

77.     By using GreatBanc in the role of ESOP trustee, Long Point and Birdsey were able to and did inflict inflated revenue and profits into the valuation and transaction price of the stock. Among other things, Defendants caused and adopted material overstatements of contractual revenue, profits and projections for business related to SUNY Polytechnic Institute, in light of Birdsey's, Starr's, and Long Point's knowledge that substantial business from SUNY Polytechnic Institute had been illegitimately obtained or had not yet been awarded and was jeopardized given its being the subject of a joint state and federal criminal investigation. Yet all of the Defendants withheld this material information from Plaintiffs and other minority stockholders of EYP.

78.     Long Point knew, based on its close and repeated work with GreatBanc, that GreatBanc would accept a course of action beneficial to Long Point at the expense of the ESOP, minority stockholders, and employees. At relevant times, GreatBanc has engaged in such improper and fraudulent schemes as a regular way of doing business.

79.     GreatBanc's conduct here with respect to EYP has been part of a common scheme and plan, and its regular way of doing business, to enrich itself through repeat relationships with private equity funds and willingness to serve outgoing controlling ownership at the expense of other employees and minority stockholders. For example, upon information and belief, including public filings in an action brought against GreatBanc, as a trustee, GreatBanc caused an ESOP to pay on its launch, in or about 2015, more than $106 million for stock in Triad Manufacturing,

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 29 of 69

Inc., actually worth less than $4 million. Upon information and belief, including public filings in

an action brought against GreatBanc, as a trustee, GreatBanc caused an ESOP to pay on its

launch, in or about 2008, approximately or more than $80 million for stock in People Care

Holdings, Inc., actually worth less than $2 million, relying on overly-optimistic revenue

projections that ignored the loss of a key contract. Likewise, upon information and belief,

including public filings in an action brought against GreatBanc, as a trustee, GreatBanc caused

an ESOP to pay on its launch, in or about 2011, an excessively-inflated value of more than $216

million for stock in Chemonics International, Inc., in violation of its fiduciary obligations.

80.     Long Point's and its affiliates' culpability is reflected in, among other things, their

continued use of GreatBanc and Wilmington Trust with various portfolio companies despite their

repeated problems with the DOL and beneficiaries of ESOPs.

81.     Despite Long Point's duties to disclose as a controlling stockholder, and Starr's,

Birdsey's, Scherr's, and Von Stroh's duties to disclose as directors, they initiated the ESOP

transaction in which they participated together, but withheld the material existence of Long

Point's and GreatBanc's financial interdependence and shared counsel, and GreatBanc's historic

wrongdoing and willingness to exploit minority stockholders to benefit the private equity funds,

such as Long Point, that retain them for service as an ESOP trustee.

82.     Instead of making adequate disclosures of conflicts of interest posed by the use of

GreatBanc and shared counsel with it, Long Point caused Birdsey to tout to EYP's senior

management that they and other employees should trust GreatBanc. In the previously-referenced

response by Birdsey to an October 23, 2015 email, he induced senior management and

employees to trust GreatBanc by stating: "Remember, the ESOP trustee is there to "protect" the

ESOP from ALL of the selling shareholders, not just a single faction" and "One could imagine a

(theoretical) scenario where all shareholders might advocate for an inflated valuation." By that time, Birdsey and Long Point had more than imagined how an inflated valuation could benefit them through disparate benefits they would create, including more than $40 million in cash for them while minority stockholders would get saddled with uncollectible notes. Not only did GreatBanc not protect any constituents, but it actually found ways to inflate the valuation further, as described in more detail below.

***Birdsey's Exposure to Criminal Liability and His Motivation to Sell on Long Point's Terms***

83.     By mid-2015, state and federal criminal investigators had undertaken a joint criminal investigation into illegal contracting, commercial bribery and bid rigging by and involving SUNY Polytechnic Institute, one of EYP's biggest and most profitable clients.

84.     Unbeknownst to Plaintiffs, in or about 2015 and early 2016, Birdsey feared that a joint state and federal criminal investigation into SUNY Polytechnic Institute would lead to a loss of substantial and highly-profitable business for EYP, as well as criminal exposure for Birdsey.

85.     In or about mid-2015, accompanied by an employee of EYP who held a senior strategist position, Birdsey attended a meeting with Alain Kaloyeros, the then-President and CEO of SUNY Polytechnic. During the meeting, Kaloyeros discussed future business with EYP as if no requisite bid would occur or matter. After the meeting, the EYP employee who had accompanied Birdsey confronted him about how it seemed the conversation had covered illegitimate no-bid contracts, to which Birdsey replied, "I was wondering when you were going to figure that out." Birdsey explained in substance that this dynamic was how his "special relationship" with Kaloyeros worked for EYP and that everything would be fine.

86.     By the end of the discussion, this employee made clear to Birdsey that he was not

satisfied with Birdsey's answers. Within days, Birdsey instructed this senior strategist, directly

and through others, to refrain from further trips to the Albany, New York office of EYP and from

working at all on matters involving SUNY Polytechnic or Alain Kaloyeros. Among other

warnings, this EYP employee heard from Leila Kamal, an EYP executive who was and is a close

and intimate friend and confidante of Birdsey. Ms. Kamal instructed this senior strategist to

refrain from further trips to Albany and not to say anything about SUNY Polytechnic or

Kaloyeros to others.

87.     Eventually Birdsey returned to this senior strategist. In or about March 2016, they

attended a meeting with Defendant Starr (Long Point's managing partner and a member of

EYP's board of directors), later joined by Watkins and an outside consultant working on

valuations for the ESOP launch. In Starr's presence, Birdsey instructed the senior strategist to

present to the outside consultant a description of business underlying a purported $40 million

contract for a project related to SUNY Polytechnic. While in Starr's presence, the senior

strategist objected to doing so because it would inflate revenue and profits through a project that

was not yet under contract, let alone the product of a legitimate bidding process. Birdsey insisted

on the inclusion of this fake and false revenue and profits, with which Starr went along without

objection. When joined by the outside consultant, Birdsey presented the project falsely as if

under contract, when it was not, with Starr also participating in the meeting.

88.     According to information obtained since in or about 2020, by in or about early

2016 before the implementation of the ESOP scheme, EYP and Birdsey received a grand jury

subpoena during the criminal investigation into conduct involving SUNY Polytechnic Institute.

By that time, Long Point, Starr and Birdsey knew that highly-profitable SUNY Polytechnic

business had been obtained illegitimately and no was longer expectable based on the subject of

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 32 of 69

bribery and fraud investigations, but they failed to disclose such information outside their inner circle beyond just acknowledging receipt of undescribed subpoenas. Instead, they allowed the ESOP pricing to be based on over-inflated valuations that treated SUNY Polytechnic Institute business as still under a highly-profitable contract when it was not.

89.     Notwithstanding Birdsey's and Long Point's knowledge that EYP would not likely retain SUNY Polytechnic Institute as a client at all and that EYP could face significant criminal liability due to Birdsey's relationship with Kaloyeros, Birdsey, Starr, Watkins and Long Point included ongoing revenue and profits related to the relationship with SUNY Polytechnic, without necessary adjustments or disclosures about the loss of business, as a material item in financial information and projections used to help establish stock price and note amounts in connection with the ESOP scheme at EYP.

90.     Also in or about early 2016, Long Point, Starr and Birdsey learned about an FBI raid at the homes of associates of Kaloyeros, making it that much more urgent for them to implement their fraudulent ESOP scheme quickly, before minority stockholders who had devoted careers to EYP could realize they would be receiving uncollectible or worthless notes while Long Point would receive more than $40 million in cash for investing about 20% of that amount a few years earlier.

91.     In or about September 2016 (three months after the close of the ESOP transaction), New York state law enforcement charged Kaloyeros, the President and CEO of SUNY Polytechnic, with, among other things, illegal bid-rigging transactions with a firm led by "Architect-1." Federal criminal charges against Kaloyeros addressed other aspects of commercial bribery in which he engaged.

92.     On July 12, 2018, Kaloyeros was convicted of the federal charges. As it turns out,

the phrase "Architect-1," used in the state criminal charges, referred to Birdsey.

93.     Birdsey's motives to participate in Long Point's ESOP scheme included loyalty to Long Point that Long Point had essentially purchased from him while he faced the criminal investigation. By late 2015, Long Point Capital and Birdsey had reached an arrangement for the increase of his holdings and options in EYP, which made Birdsey beholden to Long Point. According to certain records of EYP, from 2013 to 2014, Birdsey's direct stock ownership in EYP increased from approximately 3,451 shares to 4,759 shares. Long Point specifically agreed to a grant by EYP to Birdsey of 1,308 options valued in EYP's records at approximately $5,469,263.36. These financial transactions created a financial interdependence between Long Point and Birdsey.

94.     In connection with the implementation of the ESOP scheme at EYP, Long Point took further steps to purchase Birdsey's loyalty to and financial interdependence with it. Not only had Long Point caused the issuance of options and greater equity to Birdsey, but Long Point also caused EYP to make a unique payment of approximately $2.7 million for the benefit of Birdsey, classified as an estimated tax payment, at the time of the ESOP's launch. That allowed the delivery of a substantial amount of cash for the benefit of Birdsey without attracting attention to him in a transaction document setting forth the flow of funds.

95.     Defendants structured the resulting notes for minority stockholders into tiers that would give affiliates of Defendants Long Point, Starr, Scherr, Von Stroh, and Birdsey disparate and preferential treatment over the other minority stockholders who received subordinated notes. To solidify Birdsey's loyalty, Long Point tolerated his connection to criminal activity rather than terminate him with cause, and provided him with substantial additional stock options with a face value of approximately $5 million and direct compensation of approximately an additional $2.7

million. To solidify Watkins's loyalty, Long Point allowed him to receive Group 1 notes rather than further subordinated Group 2 notes, despite the fact that Watkins intended to continue working for EYP and that he has provided services for EYP for years after the implementation of the ESOP.

96.     Long Point also relied on the loyalty of Kempf to Long Point and Birdsey while he served as the "Sellers' Representative" in the ESOP transaction. At the close of transaction, Long Point caused EYP to send funds in the amount of $1.7 million to the Sellers' Representative, knowing he would not protect minority stockholders.

***Birdsey, Starr, Von Stroh, and Scherr Violate Their Revlon and Other Fiduciary Duties***

97.     Although not known to Plaintiffs at the time, Birdsey's and Long Point's scheme involved deliberately false and unrealistic revenue, profits, and projections, leading to an inflated valuation of EYP, in a transaction that relied on uncollectible notes for its victims.

98.     When Birdsey, Starr and Long Point planned to sell change-of-control over EYP, *Revlon* duties arose under Delaware law for all of EYP's board members. *Revlon* and its progeny provide for enhanced scrutiny of transactions that effect a change of corporate control and require directors to maximize value for minority stockholders by considering all reasonably available exit-stage transactions. In such situations, all members of boards of directors are obligated to make an informed and deliberate judgment, in good faith, about whether the sale to a third party that is being proposed by the majority stockholder will result in a maximization of value for the minority shareholders. Here, conflicts of interest preclude reliance by the Defendants on the business judgment rule.

99.     In a candid admission of the violation of *Revlon* duties, in response to an employee concerned employees would be forced to overpay for the purchase of EYP through an

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 35 of 69

ESOP, on or about October 23, 2015, in the previously-referenced responses by Birdsey to

questions from Charles Kirby, Birdsey wrote: "Please remember that if LPC was only looking

for top dollar, they would be lobbying to sell to a strategic buyer."

100.    A sale of EYP to a strategic partner such as Stantec, rather than to an ESOP,

would have offered synergies and increased value to minority stockholders, but likely would

have required *pro rata* treatment of other stockholders consistent with the treatment of Long

Point and Birdsey. Defendants knew that, unlike an ESOP buyer that they could create, Stantec

would engage in due diligence that would raise questions about, among other things, Birdsey's

relationship with SUNY Polytechnic and EYP's value given the uncertainty of revenue and

profits from SUNY Polytechnic. Upon information and belief, Stantec offered an imminent

opportunity for an acquisition at a greater actual value for EYP's stockholders as a whole than

did the ESOP scheme. The use of an ESOP offered the opportunity, however, for Defendants to

create a buyer on their terms, which would agree to a purchase price based on over-inflated

financials and valuations, providing access to cash for select wrongdoers at the expense of other

stockholders who would receive uncollectible notes.

101.    Without meaningful analyses that should be reflected in board minutes, but are

not, in 2016, the EYP board rushed its ESOP scheme at an unfairly-inflated price from which

Long Point and Birdsey received virtually all of the cash and cash-equivalent benefits, while

choosing not to explore or consummate the availability of strategic suitors that would have

offered added value for all constituencies based on synergies. Shortly before implementation of

the ESOP, and contrary to the board of directors' *Revlon* duties, Birdsey summarily terminated

discussions with Stantec, a large, publicly-traded suitor in the design and engineering industry

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 36 of 69

that sought to acquire EYP.

102.    The Defendants' ESOP scheme facilitated an exit transaction with more than $40 million cash out the door to Long Point, while saddling EYP and the ESOP with the impact of enormous debt and debt servicing burdens. When an exit strategy triggers a stockholder investment decision, the directors of a Delaware corporation are required to disclose fully and fairly all material information within the board's control. Inadequate disclosures about a "liquidation preference" can be deemed material as a matter of law. Boards functioning under the control of private equity funds operate under a business model that causes them to seek outsized returns and to liquidate (typically via a sale) even profitable ventures that fall short of their return hurdles, and that otherwise would require investments of time and resources that could be devoted to more promising ventures. Birdsey, Starr, Von Stroh, Scherr, and Watkins, as well as Long Point itself in its control of the board of EYP, had interests that diverged from those of EYP's other stockholders generally and that provided the Defendants with disparate and preferential treatment from the implementation of the ESOP. Had the EYP board members and controlling stockholders fulfilled their fiduciary duties and consummated a transaction based on interests aligned with other stockholders, EYP and its constituents would likely have enjoyed greater than $95 million in value of which they have been deprived.

103.    By in or about June 2016, each of Birdsey, Starr, Scherr, Von Stroh and Watkins participated as directors of EYP's board, to approve the ESOP transaction, which amounted to self-dealing for the benefits they received, without satisfying their *Revlon* and other fiduciary duties, for the benefit of themselves, Long Point and its affiliates, at the expense of minority stockholders. Instead of fulfilling *Revlon* duties and making adequate disclosures, Birdsey and Long Point created a buyer, and imposed an unfair price through an unfair process. On repeated

34

Case 1:23-cv-01437-AMN-DJS   Document 1-1   Filed 04/13/22   Page 37 of 69

occasions, each of the Defendants used and promoted a materially inflated valuation of EYP in discussions with Plaintiffs and other minority stockholders, along with other incomplete, false and misleading statements touting the fairness of the process.

104.    As a result of their scheme, Long Point and Birdsey received cash and other personal benefits, providing them with disparate benefits as compared to Plaintiffs. Long Point and its affiliates received more than $44 million as a return on an investment of approximately $9 million. With Long Point's affiliates as the controlling stockholder group, Birdsey received support from EYP through the joint state and federal criminal investigation, and received additional options and a $2.7 million payment classified as a tax reimbursement. Watkins received Group 1 rather than Group 2 notes. Other stockholders received uncollectible notes that were worth far less than their face value, if anything. Since the implementation of the ESOP and Long Point's exit, EYP has failed to make the contemplated installment payments on notes for noteholders and former shareholders.

105.    Long Point, Birdsey, and Starr knew that Group 2 noteholders would not get paid, or recklessly disregarded the likelihood that they would not get paid, the full value of their notes. That is why Long Point and Birdsey purposefully assigned Group 2 notes a maturity date of 2051, approximately thirty-five years after the ESOP transaction, and long after Birdsey and Long Point would cease their involvement in EYP (if it still existed).

106.    In order to ensure that their scheme was approved, Long Point ensured that one of its "transaction" counsel for the ESOP conversion, Ropes & Gray, also served as EYP's counsel in corporate matters, thus assuring that neither EYP nor its stockholders had truly independent counsel with adequate information to question Long Point's scheme.

107.    According to Long Point's own records, Long Point shared with GreatBanc the

same outside counsel for the ESOP conversion, K&L Gates, despite the obvious conflict of interest.

108.    As of June 28, 2016, there were no independent fiduciaries or unconflicted advisors involved in the structuring, valuation, and approval of the ESOP transaction, thus assuring that the fraudulent nature of the transaction remained hidden from EYP's minority stockholders.

109.    Unable to obtain further financing so that Long Point could receive all of the purchase price in cash, EYP issued Long Point a priority note in excess of $3 million, which conflicted board members allowed despite those notes being structurally superior to the redemption, Group 1, and Group 2 notes.

110.    Despite owing fiduciary duties of loyalty to Plaintiffs and other minority stockholders of EYP, Defendants Long Point, Long Point Fund II, Long Point Fund III, Starr, Von Stroh, Scherr, and Birdsey engaged in self-dealing to benefit themselves in the ESOP transaction in a disparate way from others, while withholding (in violation of duties to disclose) material information concerning the inflated valuations on which pricing was based, thus enabling Long Point and its affiliates to receive the available cash in excess of $40 million while leaving Plaintiffs and other minority stockholders with uncollectible notes.

111.    At the close of the transactions, EYP and certain affiliates were left with more than $100 million in debt and limited cash on hand, while facing an uncertain future due to ongoing criminal prosecution concerning one of its largest and most profitable clients.

112.    As of June 28, 2016, EYP was rendered insolvent, with an inability to meet its ongoing and imminent debts. Long Point, Birdsey, Von Stroh, and Scherr knew that EYP lacked the prospects for meeting obligations to its redemption, Group 1 and Group 2 noteholders. Up

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 39 of 69

until final drafts of agreements to launch the ESOP, Defendants repeatedly promised Plaintiffs and other minority stockholders prompt installment payments upon retirement. These promises were sufficiently clear and definite, and Plaintiffs and other minority stockholders detrimentally relied on those promises by consenting to the launch of an ESOP, which has equitably estopped EYP from denying such benefits. In contravention of these promises and shortly before the ESOP transaction was consummated, Defendants added or caused to be added maturity dates in redemption, Group 1 and Group 2 notes. EYP has relied on these maturity dates as a basis for their withholding of periodic payments. During the weeks leading up to the ESOP closing, Defendants falsely informed, and caused false statements to be made to minority stockholders suggesting that changes in maturity dates were not changes in payment dates and that the changes were "for optics purposes for the bank refinancing."

113.    From in or about early 2016, through the board approval of the ESOP scheme and the closing on or about June 28, 2016, Defendants Long Point, Starr, and Birdsey repeatedly promoted and caused each other to promote the ESOP conversion and represented the materially inflated valuation to be fair, when they knew the process and valuation had been and would be unfair to the Plaintiffs and minority stockholders because of the debt imposed on EYP and the $40 million in cash removed by Long Point's affiliates.

114.    For example, in the previously-referenced email on or about October 23, 2015, Birdsey responded to Charles Kirby by acknowledging his awareness of conflicts of interest related to the ESOP, but falsely and materially downplaying the existing conflict among stockholders and Long Point, and solicited management and employees to trust GreatBanc despite its historic problems and financial-interdependence with Long Point, stating:

> First of all, your statement that management shareholder's and LPC's valuation
> objectives are in conflict is an opinion that is not necessarily shared by all

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 40 of 69

management shareholders (in fact, the opposite sentiment has also been expressed by some); nevertheless, and irregardless [sic] of one's personal view of this, my understanding is that because of the ESOP transaction, the valuation will be set by an independent, valuation expert. As mentioned, the trustee will not approve a valuation that he/she determines to create an unfair burden to the ESOP.

115.    As another example, in or about November 17, 2015, Birdsey pushed management at the firm to join an "ESOP Commitment Statement" so that an ESOP launch could be completed "[a]lthough aggressive," by the end of 2015. Despite actual plans to use an unfair process and inflated valuation that would make preferential payments to Defendants at the expense of minority stockholders, Birdsey represented specifically that a "primary" focus of the board-driven effort would be on using both a fair valuation of the firm and a fair design of the plan. Based on these representations, by on or about November 17, 2015, Birdsey identified himself and Watkins as the first two leaders of the firm to sign onto this commitment and induced several other senior practice leaders to commit to an ESOP buyout. Birdsey thereby induced several of the Plaintiffs to trust them in their launch of an ESOP, and to cause other Plaintiffs and those similarly situated to trust them as well.

116.    As another example, on or about January 7, 2016, knowing it was based on a materially inflated valuation and plans to unjustly enrich Defendants at the expense of Plaintiffs and other minority stockholders, Long Point, Birdsey, and Starr caused "working group recommendations" and "terms for ESOP transaction" to be circulated to Plaintiffs and others similarly situated. Though EYP employed outside advisors, the valuation information on which the ESOP transaction was based, and on which Plaintiffs and others similarly situated relied, turned on false representations by Birdsey and others about the business and performance by Defendants. In a written presentation dated January 7, 2016, an outside advisor expressly notes that the report had assumed financial information and statements "have been reasonably prepared

38

on bases reflecting the best currently available estimates and judgments of management…." In reality, at the time, Defendants' existing contracts and forecasts were knowingly materially inflated to make cash available for Defendants while using worthless or near worthless notes for their victims. Yet in numerous presentations and discussions between then and the closing of the ESOP transaction, Long Point, Starr, and Birdsey knowingly touted false claims, and failed to make corrective disclosures to Plaintiffs and others similarly situated about such false claims, that the process and valuation were fair and reliable.

117.    In or about early spring 2016, Birdsey led a small group conference call to promote the ESOP to certain stockholders of EYP, including Plaintiff Jason Steinbock. During the call, Watkins encouraged other participants to downplay to other EYP employees and stockholders the onerousness of agreements they would be asked to sign. Steinbock expressed concerns about that and was not invited to further small group meetings.

118.    Defendants compounded these misrepresentations about the fairness of the ESOP with material omissions, despite duties to disclose as fiduciaries both the existing business dropoff related to ongoing criminal investigations into the SUNY Polytechnic business and Stantec's willingness to purchase EYP.

***Defendants Continue to Defraud Noteholders after the Closing of the ESOP Transaction***

119.    In or about 2015, EYP entered negotiations with architecture firm Stanley Beaman & Sears ("SBS"), leading to a merger and acquisition transaction. These discussions had been put temporarily on hold pending the close of the ESOP transaction.

120.    Shortly after June 28, 2016, EYP, through Birdsey, approached SBS to renew negotiations. EYP offered to purchase SBS for $3 million. EYP informed SBS that it would pay a small amount of cash at closing, warrants, and $2.4 million in Group 2 notes. Birdsey

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 42 of 69

explained that EYP wanted to offer SBS a significant amount of notes so that the SBS equity

owners had the "same opportunity that all EYP Principals were given at the ESOP transaction in

exchange for their old EYP stock." Despite their knowledge that Long Point had used an inflated

valuation, Birdsey, CFO Kempf, and EYP's consultant Modicum presented SBS with

Defendants' materially false valuation of EYP to convince SBS that the notes had a value of $2.4

million and that SBS would receive ongoing interest payments and the principal on these notes.

At that time, Birdsey knew that EYP would not be able to pay the $2.4 million in notes and that

the notes were not collectible.

121.    Birdsey worked on the acquisition of SBS in furtherance of the ongoing

conspiracy with Starr, Watkins and Long Point, which still held a note purporting to be senior to

redemption, Group 1 and Group 2 noteholders.

***Fraudulent Concealment of Birdsey's and Long Point's Culpability***

122.    Since defrauding other constituents of EYP, on behalf of and in furtherance of the

conspiracy among all Defendants, Birdsey, Starr, and Long Point have fraudulently and actively

concealed and covered up their wrongdoing through at least early 2020. The complex ESOP

scheme itself was a self-concealing fraud, requiring a long-term group cover-up, as many

potential plaintiffs continued to work for EYP.

123.    In or about July 2020, Plaintiffs uncovered business records of Long Point

indicating its practice, when implementing its ESOP scheme, of planning to withhold material

information from portfolio company employees by sharing only the number of shares that have

been allocated to the employee through the ESOP and an annual valuation of those shares, and

no other meaningful information. As a result, Long Point set in motion a process that deprived

minority stockholders who are employees of material financial and business information that

40

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 43 of 69

would affect their decisions about buying or selling shares at all, from or to an ESOP. Likewise, as a result of this practice, Defendants have been able to prevent Plaintiffs and others similarly situated to them from learning about the Defendants' culpability in the ESOP scheme.

124.    Defendants, despite their ongoing fiduciary duties to Plaintiffs, structured the ESOP transaction to retain board positions for Birdsey, Starr and Watkins, and thereby control messaging, restricting financial information that would reach potential plaintiffs, and enabling the Defendants to cover up their fraud. Birdsey, who remained Chairman of the Board of Directors after the commencement of litigation against him and until in or about February 2021. Facing mounting pressure from noteholders and claims against it, in or about February 2021, Defendant GreatBanc voted in a new slate of directors. Until that time, Birdsey, Starr on behalf of Long Point, and GreatBanc continued to provide materially misleading and false information, blaming EYP's inability to pay on a purported slip in performance, while in actuality the covenants attached to the massive debt arising from the ESOP resulted in the inability to pay obligations to Plaintiffs and others similarly situated to them. These board positions have enabled Birdsey and Starr to deprive Plaintiffs of information that would support the claims herein and can be obtained only through discovery.

125.    In addition, Defendants structured the ESOP transaction as a buyback by EYP of stock, which it then resold to the ESOP, in order to have a superficial reason for withholding appraisal rights and disclosures under Delaware law for and to minority stockholders.

126.    Until in or about early 2020, Birdsey and Starr repeatedly falsely assured stockholders and noteholders that the ESOP only "enhanced" EYP's ability to pay, which was a materially false statement. The board falsely represented to multiple parties that the ESOP and its financing structure enhanced the company's resources, while withholding from other former

41

stockholders that the notes EYP issued to them as part of the transaction were worth far less than

face value. When doing so, the board omitted how the debt imposed on EYP made it impossible

for any subordinated debt to be satisfied in a remotely timely manner. In the course of inducing

the Plaintiffs and those similarly situated to them to enter into note and subordination agreements

surrounding the implementation of the ESOP, Birdsey, Starr, Scherr, and Von Stroh omitted

from disclosures the impact of onerous debt covenants that clearly could not be satisfied in even

the short term following the ESOP transaction. Indeed, unknown to Plaintiffs and other minority

stockholders, EYP was in default of covenants and insolvent from at or near the outset of the

ESOP's launch.

127.   Since their implementation of the ESOP scheme through at least early 2020, on

behalf of all Defendants and in furtherance of their conspiracy, Birdsey, Starr, and Long Point

falsely touted the benefits of the ESOP structure while blaming EYP's inability to pay even

interest to noteholders entirely on supposedly surprise performance issues. For example, on

March 24, 2017, while he, Starr and Watkins remained board members, Birdsey falsely informed

noteholders in writing that "Although formation of the ESOP *enhanced* our ability to make these

covenant and tests and resulting payments, unfortunately the business results were such that the

payments would have been disallowed either with or without the ESOP transaction." While

Birdsey made that statement, Defendants intentionally failed to inform Plaintiffs that the 2016

valuations for the ESOP formation relied on inflated revenue and profits, including amounts

attributable to SUNY Polytechnic projects that were not real or reliable, but instead either did not

exist or were jeopardized entirely by criminal conduct and investigations, and that the stock price

used to calculate Long Point's buyout and note values was over-inflated and did not remotely

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 45 of 69

reflect the true value or projected value of the company.

128.    In other words, despite a duty to disclose, Defendants concealed from Plaintiffs that the ESOP transaction itself made it impossible for EYP to meet its loan covenants and that Long Point and Birdsey received substantial cash while minority stockholders received uncollectible notes.

129.    Prior to and including the end of calendar year 2017, Birdsey and Starr evaded a growing number of questions from noteholders, often referring noteholders to each other and failing to provide accurate or complete answers. Also, when falsely touting benefits of the ESOP structure, Birdsey and Starr failed to disclose their insistence on unrealistic valuations that included fake revenue and profit figures used in the sale to the ESOP, including the valuations' dependence on existing and steady business from SUNY Polytechnic. Financial data and projections underlying the unreliable valuations deviated materially from genuine management estimates, resulting in an inflated valuation that provided disparate benefits to Long Point and Birdsey, , in the form of more than $40 million in cash, while minority stockholders received uncollectible notes.

130.    As recently as in or about early 2018, Birdsey again gave instructions to the senior strategist who accompanied him to meetings with Kaloyeros and an outside consultant working on a stock valuation for the ESOP launch, warning the EYP employee not to say anything to anyone about those meetings and related topics.

131.    Not until July 10, 2018 at the earliest did Birdsey or Long Point describe in any meaningful detail the impact of onerous covenants with the senior secured lender in a manner that would allow noteholders to understand the effect of the massive debts imposed as part of the ESOP transaction. Unknown previously to the Plaintiffs and other noteholders, the inability to

Case 1:23-cv-01437-AMN-DJS     Document 1-1     Filed 04/13/22     Page 46 of 69

satisfy these specific covenants could make the notes payable to them worth far less than their face value. Even then, Defendants continued to express optimism about the future prospects of EYP.

132.    In a recorded presentation accompanied by a power-point presentation, on or about October 11, 2018, Birdsey continued to make false statements, including on behalf of Long Point, to justify falsely the accuracy of the financial information that had been used to value EYP for the ESOP conversion. At that time, Birdsey did acknowledge, however, that GreatBanc (remarkably) performed a belated valuation shortly before the transaction that purportedly justified it paying as trustee an additional $7 million for the equity in EYP. The revelation that GreatBanc played a role in inflating a valuation and accepting increases that Long Point requested ran directly contrary to Birdsey's representations before the ESOP, as described above, that GreatBanc would serve as a safeguard to protect against an "inflated valuation."

133.    The inflated valuation used for the ESOP enabled Long Point to receive more than $40 million in cash while minority stockholders received uncollectible notes. In the same recorded presentation, Birdsey also acknowledged that, through the valuations used for the ESOP conversion, minority stockholders received their (uncollectible) notes with face values between 1.8 ad 1.9 times the amount at which their respective equity interests had been previously valued.

134.    At the time of the ESOP transaction, Birdsey, Starr, and Long Point had failed to disclose to other former stockholders and later noteholders the existence and amount of a valuation obtained by GreatBanc as the ESOP trustee, which fell at least $20 million below the valuations generated by the Long Point-led EYP board. The substance of this valuation remained hidden from minority stockholders and noteholders until restructuring work at EYP in or about early 2020. As reflected in information uncovered at that time, the conflicted ESOP trustee at

44

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 47 of 69

GreatBanc quickly departed from the already-inflated valuation that had been provided to it, instead hastily and corruptly accepting an even higher value based on what Long Point sought.

135.   Birdsey, Starr, Von Stroh, Scherr, and Long Point also failed to disclose their reliance on valuations much higher than any independent valuation for an ESOP, which enabled them to justify more cash out the door to Long Point and for Birdsey's benefit, while imposing on minority stockholders uncollectible notes.

136.   Not until late 2018 did the fraudulent nature of Birdsey's, Starr's, Von Stroh's, Scherr's and Long Point's wrongdoing and culpability slowly start to come to light in piecemeal fashion. For example, on or about September 26, 2018, third-party consultant Terry Johnson revealed to one of the Plaintiffs the deep interest that Stantec had in an acquisition of EYP and the abrupt termination of those talks by Birdsey and Long Point.

137.   It was not for another year that other aspects of the Defendants' misconduct and scienter came to light. In or around fall 2019, EYP retained independent directors and outside service providers to attempt to restructure EYP's debt. Until the retention of the independent directors, Birdsey, as chairman of the board of directors, and Long Point (through Starr), were able to fraudulently conceal Defendants' wrongdoing by issuing materially false, incomplete and misleading statements about these matters that still touted purported overall financial enhancements for EYP based on the ESOP.

138.   To avoid detection of their scheme, Birdsey and Long Point (through Starr, Von Stroh and Scherr), on behalf of all Defendants and in furtherance of their conspiracy, also concealed from minority stockholders Stantec's interest and efforts to acquire EYP, as well as the hasty termination of the talks. Birdsey and Starr have made false statements and false denials to one or more noteholders, on behalf of themselves, each other and Long Point, suggesting that

45

entities such as Stantec and/or other strategic suitors had not been viable candidates for acquiring EYP.

139.     As recently as in or about December 2017, Birdsey and Starr made false statements and false denials on behalf of Defendants and in furtherance of their conspiracy, specifically that EYP's defaults on covenants that prevented payment on redemption, Group 1 and Group 2 notes had been technical and temporary in nature and were on the verge of cure, without admitting the flaws underlying the selection and use of the ESOP structure.

140.     In reality, Stantec was a viable acquiror, and EYP's defaults on covenants had been substantial and, as a practical matter, not curable without a major restructuring at EYP.

141.     Between in or about 2018 through in or about February 2020, Birdsey and Starr (on behalf of each other and the other Defendants and in furtherance of their conspiracy) engaged in efforts to amend the terms of covenants with EYP's senior secured lender, without adequate disclosures to Plaintiffs and those similarly situated, in a manner designed to delay the inevitable enforcement of noteholders' rights against Defendants. Birdsey, Long Point, and Starr, on behalf of the Defendants and in furtherance of the conspiracy among the Defendants with whom they conspired, portrayed falsely to Plaintiffs and those similarly situated that the lack of payments on notes arose merely from temporary delays on the verge of a cure, when in fact the financial problems had mounted into insolvency long before that.

142.     On July 18, 2020, Birdsey and Starr continued and compounded their acts of fraudulent concealment. In a blast email by Birdsey, as Chairman of the board of directors, to most of EYP's noteholders, Birdsey made statements to noteholders designed to deflect responsibility away from him and Long Point by making it seem that he was in the same position as other noteholders and had not received benefits of any special funds at the implementation of

Case 1:23-cv-01437-AMN-DJS          Document 1-1          Filed 04/13/22          Page 49 of 69

the ESOP scheme at EYP. Specifically, he stated his goal was "to clear up any misinformation or misunderstandings about the 2016 ESOP Transaction," but instead concealed that he had received the benefit of a $2.7 million payment for his benefit and directed the recipients to "the flow of funds memorandum for the 2016 ESOP Transaction." That memorandum had omitted a description of the $2.7 million payment as a payment of Birdsey's tax liability. Birdsey copied, among others, EYP's board of directors, including Starr. Despite his ongoing fiduciary duties, including to noteholders as EYP was then insolvent, and his knowledge that Birdsey's statements about the ESOP transaction were false and misleading, Starr did not correct Birdsey's false and misleading email.

143.   In a further act of fraudulent concealment, which remains ongoing, and as counsel for independent directors has informed Plaintiffs, directors, including Starr and Birdsey, did not maintain, as they were required to do, board minutes from in or around 2015 through in or about August 2016. Upon information and belief, Defendants did not maintain such board minutes to avoid creating a record of the fraudulent nature of their transactions.

144.   Defendants purposely waited more than three years – the time period for bringing a breach of fiduciary duty claim under Delaware law in the absence of a ground for tolling the limitations period – before allowing and causing EYP to acknowledge the extent of its financial problems and explore a restructuring. Nevertheless, their acts of fraudulent concealment served to toll the statute of limitations.

145.   In sum, from no later than in or about 2015, through the filing of a complaint in federal court against them, Defendants knowingly and willfully conspired with each other and others, in New York and elsewhere, (1) to defraud and exploit EYP's minority stockholders in connection with the ESOP scheme, and EYP noteholders with issuance of redemption notes,

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 50 of 69

Group 1 notes and Group 2 notes; (2) to breach and aid and abet breaches of fiduciary duties

owed to minority stockholders and, since EYP became insolvent, creditors, including

redemption, Group 1, and Group 2 noteholders; and (3) to fraudulently conceal and cover up

Defendants' wrongdoing. Each of the Defendants took overt acts in furtherance of the

conspiracy, as described above. None of the Defendants has made any effort to withdraw from

the conspiracy, as they continue to act jointly, concealing and covering up their wrongdoing

despite Birdsey's and Starr's ongoing duties to disclose the omitted material facts as members of

EYP's board of directors until in or about February 2021.

*The Noteholders' Notes*

146.    In 2016, EYP did not have sufficient cash to pay the stock purchase price for

Long Point, which obtained more than $40 million, and Birdsey, who obtained more than

$2.7 million in disparate cash benefits. Therefore, in order for Long Point to recognize its 500%

return on its investment, Long Point and Birdsey had to take out a substantial senior bank loan

and convince minority stockholders to accept subordinated notes in exchange for their stock

shares.

147.    In connection with the ESOP scheme at EYP, Long Point and Birdsey developed

three categories of notes: (1) "redemption" notes for those already retired or retiring at the time,

generally carrying a maturity date in or about December 2021; (2) "Group 1" notes for those

existing employees planning to retire  by approximately 2019, generally carrying a maturity date

in 2051; and (3) further subordinated "Group 2" notes for then-existing employees who did not

have imminent retirement plans, also carrying a maturity date of 2051.

148.    In connection with soliciting and purchasing stock and inducing sales and

execution of notes by Plaintiffs, Starr and Birdsey, as fiduciaries, made numerous presentations

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 51 of 69

to minority stockholders and employees of EYP falsely touting the fairness of the process to establish a stock price and the use of supposedly independent professionals to calculate the value of EYP.

149.     In the months before and after the close of the ESOP transaction, Birdsey and Kempf met with Plaintiff Sears and other equity owners of SBS. Birdsey and Kempf presented Plaintiff Sears and other equity owners of SBS with the over-inflated valuation in order to convince Plaintiff Sears and other equity owners of SBS to accept Group 2 notes, allegedly representing $2.4 million of the $3.0 million purchase price.

150.     Birdsey and Starr concealed from minority stockholders and employees of EYP, and Plaintiff Sears and equity owners of SBS, that Birdsey and Starr provided false revenue and profit data to the independent professionals, and that Long Point had long-standing working relationships with the professionals that made them not truly independent.

151.     Plaintiffs and other minority stockholders of EYP reasonably relied on the Defendants, as fiduciaries, to protect their interests. Instead, the Defendants engaged in self-dealing at the expense of the beneficiaries of the fiduciary duties of loyalty that they violated.

152.     Birdsey's and Long Point's conspiracy dramatically impacted and injured each of the Plaintiffs and other noteholders who depended on proceeds from the sale of stock for their retirement.

153.     As a direct and proximate result of the Defendants' ESOP scheme at EYP, as the administrator of the estate of her late husband, Ed Kohlberg, Plaintiff Kohlberg holds an amended note dated June 28, 2016 on which she remains owed $3,330,377.21 plus interest, with a maturity date in or about December 2021. As Ed Kohlberg had retired and died the prior year, at about the time of the ESOP transaction, EYP owed to Kohlberg an installment payment in

Case 1:23-cv-01437-AMN-DJS   Document 1-1   Filed 04/13/22   Page 52 of 69

excess of $2 million. Birdsey personally pressured Kohlberg into amending the note issued in 2015, in a manner that cut the payment due in approximately half, deferring the remainder for another year. In the weeks leading up to this modification, Birdsey contacted Kohlberg directly to induce her into trusting him about the ESOP launch, which he did in part by knowingly misrepresenting to her that her late husband Ed had supported the plan. Neither that deferred payment nor any other payment since that time has been made to Kohlberg.

154.     As a direct and proximate result of the Defendants' ESOP scheme at EYP, Eijadi holds redemption notes dated June 28, 2016 in the amount of $985,475.86 plus interest, with a maturity date in or about December 2021. He sought to retire prior to the ESOP.

155.     As a direct and proximate result of the Defendants' ESOP scheme at EYP, Jurkowski holds redemption notes with five-year maturity terms, one initially issued on March 18, 2016 and amended on June 28, 2016 in the amount of $166,952.01, and another dated June 10, 2016 in the amount of $164,343.15, on which a principal payment of $55,650.67 has been made, leaving a balance of approximately $275,644.51 plus interest.

156.     As a direct and proximate result of the Defendants' ESOP scheme at EYP, Lassor holds a Group 1 note dated June 28, 2016 in the amount of $1,615,667.30 plus interest, as amended to confirm a five-year maturity date.

157.     As a direct and proximate result of the Defendants' ESOP scheme at EYP, McDougall holds a redemption note initially issued in 2015 in the amount of $248,638.67 for which $165,759 remains outstanding and a Group 1 note dated June 28, 2016 in the amount of $5,870,735.98, plus interest.

158.     As a direct and proximate result of the Defendants' ESOP scheme at EYP,

50

Ottavio holds a Group 1 note dated June 28, 2016, in the amount of $4,790,584.37 plus interest.

159.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, Steinbock holds a Group 2 note dated June 28, 2016 in the outstanding amount of $951,172.96 plus interest, with a maturity date of on or about June 28, 2051.

160.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, Sears holds a Group 2 note dated December 30, 2016, in the amount of $760,148.06 plus interest.

161.    Plaintiffs' notes are uncollectible as a result of defaults on covenants by and insolvency of EYP. Defendants caused the notes to be subordinated to senior secured debt and to further note obligations purportedly owed to Long Point. Defendants further caused all Group 2 notes to be subordinated to Group 1 notes, the majority of which are owned by Birdsey and Watkins. As a result, EYP has not made any payments on any of these notes held by Plaintiffs or other former minority stockholders in EYP since the implementation of the ESOP scheme at EYP.

162.    These Plaintiffs and other noteholders and employees of EYP experienced intense pressure that management placed on them to sign onto the notes, each being convinced that they could hurt other employees and minority stockholders by not agreeing to the notes' terms. None of the Plaintiffs or other noteholders was provided with adequate details about the ESOP transaction, prior to the time they had to vote on whether to approve the ESOP, to understand the extent to which Birdsey, Starr and Long Point were exploiting them. Birdsey and Long Point also repeatedly gave false assurances about purported financial enhancements that the ESOP created at EYP, while failing to disclose facts that made the notes uncollectable after the ESOP transaction.

163.    Each of the Plaintiffs expected to enjoy retirement with his or her earned nest egg.

51

Instead, the scheme to defraud them has caused substantial stress and financial damage to each of them in at least the face amount of the notes plus interest. In total, the Plaintiffs alone are owed approximately $20 million with interest.

***Tolling Agreement and Savings Statute***

164.     In addition to tolling based on fraudulent concealment by Defendants, a tolling agreement and prior federal action also toll any potentially applicable statute of limitations.

165.     Plaintiffs are parties to a tolling agreement that excludes from any applicable statute of limitations or repose the period from the start of tolling from Coronavirus-related court shutdowns through and including August 15, 2020.

166.     Under CPLR 205 and common law, a prior federal action further tolled any applicable statute of limitations, from on or about August 7, 2020, through at least the filing of this action.

***Motive, Opportunity and Illicit Conduct***

167.     Long Point engaged in its fraudulent ESOP scheme motivated by cash, specifically more than $40 million that its affiliates could obtain from the transaction that exploited minority stockholders. Birdsey's motivation included (1) his desire to receive the benefit of $2.7 million cash and assignment of Group 1 rather than Group 2 notes; (2) his desire to consummate the transaction expeditiously, including in part a desperation associated with the exposure and urgency posed by the above-described criminal investigations into his special relationship with Kaloyeros; (3) his desire to retain his ongoing leadership role at EYP despite good cause existing for his termination; and (4) his attempt to avoid financial devastation and other collateral consequences for him that would have been caused by his termination for cause. GreatBanc has been motivated by its repeat business and financial interdependence with Long

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 55 of 69

Point.

168.    All of Birdsey, Long Point, Starr, Von Stroh, and Scherr had the opportunity to structure the ESOP scheme and related transactions to benefit themselves with full access to EYP's financial information and insight into the investigation and prosecution of one of EYP's largest and most profitable clients, which minority stockholders lacked. Long Point further created an opportunity to exploit minority stockholders by sharing one of its outside counsel, Ropes & Gray, with EYP, and sharing another outside counsel, K&L Gates, with GreatBanc. These insider relationships facilitated the corruption of EYP's directors and advisors, while cloaking incriminating communications in a superficial claim of attorney-client privilege.

169.    Beyond motive and opportunity, each of the Defendants engaged in illicit conduct and received financial rewards in connection with the ESOP. For example, Birdsey and Long Point through Starr, participated in a meeting with an outside consultant working on the stock valuation for the ESOP, in which they presented false and materially inflated contract, revenue and profit figures. They and Long Point principals Von Stroh and Scherr approved the ESOP transactions. GreatBanc violated the terms of then-recently imposed requirements on it by the DOL based on similar misconduct involving other companies, as well as its statutory fiduciary duties to the ESOP.

170.    The Defendants' various roles formed integral parts of the fraudulent ESOP scheme, as their combination of efforts made possible the accomplishment of the scheme and victimization of Plaintiffs and those similarly stated.

***Class Action Allegations***

171.    Plaintiffs bring this action on their own behalf and as a class action on behalf of all present redemption noteholders, Group 1 noteholders and Group 2 noteholders of EYP who

did not culpably participate in the disloyal creation and implementation of the Defendants' ESOP scheme at EYP (the "Class"). Upon information and belief, all such noteholders have held their interests as a result of the Defendants' fraud and at a time, from late 2015 through the present, when one or more of the Defendants breached their fiduciary duties owed to Plaintiffs and others as both minority stockholders and as noteholders.

172.    Upon information and belief, putative class members have received Redemption, Group 1 or Group 2 notes in connection with the ESOP conversion on or about June 28, 2016 or during the acquisition of SBS on or about December 30, 2016.

173.    Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants, and any other noteholders who culpably participated in the development of the ESOP scheme.

174.    The Class Period covered by this class action is November 10, 2015 through March 16, 2020, during which time Defendants took steps to over-leverage EYP as part of an inflated stock price in a sale to an ESOP through which only they would receive cash, while putative class members sold their stock in or to EYP in exchange for sham and uncollectible Redemption Group notes, Group 1 notes and/or Group 2 notes.

175.    This action is properly maintainable as a class action.

176.    The Class is sufficiently numerous that joinder of all members, whether otherwise required or permitted, is impracticable. There are likely more than 75 noteholders in the Class.

177.    In the alternative to a class of noteholders generally, the noteholders could be divided into sub-classes, according to the group to which they were assigned as noteholders.

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 57 of 69

178.    There are questions of law and fact that are common to the Class and which predominate over questions affecting only individual Class members. The common questions include, among other things, the following:

(a)    Whether as a controlling stockholder Long Point and its affiliates, and the directors on the board and officers Long Point controlled breached their fiduciary duties in connection with the board's implementation of the ESOP scheme at EYP;

(b)    Whether the controlling stockholder Long Point and its affiliates aided and abetted the directors' breaches of their fiduciary duties in connection with the board's implementation of the ESOP scheme at EYP;

(c)    Whether Defendants acted with scienter; and

(d)    Whether the Defendants can show the fairness of the totality of the transactions under Delaware's entire-fairness doctrine, or the extent to which they must return to Plaintiffs and similarly situated stockholders the proceeds they received from ESOP scheme.

179.    Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs do not have any interests adverse to the Class.

180.    Plaintiffs are adequate representatives of the Class, have been involved with EYP sufficiently to know its business, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

181.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 58 of 69

members of the Class, which would establish incompatible standards of conduct for the Defendants.

182.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

183.    Defendants have acted in a manner generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole. In the prior federal action, the Court approved the Plaintiffs as qualified to serve as "Lead Plaintiffs" before declining to exercise jurisdiction over state law claims.

**Count One**
(Breach of Fiduciary Duty of Loyalty Against Birdsey, Long Point, Long Point Fund II, Long Point Fund III, Starr, Scherr, and Von Stroh)

184.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

185.    At the relevant times, each of the Defendants herein owed fiduciary duties to Plaintiffs and those similarly situated, including the duties of undivided loyalty, care, and obedience. In or about 2015 through on or about June 28, 2016, Defendants owed such fiduciary duties in favor of Plaintiffs and the other minority stockholders, and since in or about June 2016 to Plaintiffs as creditors and other creditors after EYP became insolvent as a result of the ESOP transactions.

186.    Each of the Defendants willfully breached their duties of loyalty in connection with the controlling stockholder group-initiated ESOP transaction. As described above, they breached their *Revlon* and other fiduciary duties by failing to pursue Stantec's offer and, instead,

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 59 of 69

implementing the ESOP scheme without a fair process or price.

187.    Since that time, Defendants have actively and fraudulently concealed and covered up their breaches, as described above, despite Birdsey and Starr having ongoing duties to disclose such matters as members of EYP's board of directors.

188.    As a direct and proximate result of Defendants' breaches of fiduciary duties of loyalty, Plaintiffs and those similarly situated have been damaged by at least the value of outstanding principal and interest on the redemption, Group 1 and Group 2 notes that they hold.

**Count Two**
(Fraud Against Defendants Long Point, Long Point II, Long Point III, Starr, and Birdsey)

189.    Plaintiff repeat and incorporate each of their prior allegations as if repeated in full herein.

190.    The scheme to defraud at issue arises largely from the concealment of material information by fiduciaries who initiated an end-stage transaction that gave them substantial disparate benefits, namely more than $40 million in cash and cash equivalents, while saddling with uncollectible notes those to whom they owed fiduciary duties.

191.    This scheme to defraud was self-concealing, and Defendants enabled themselves to hold ongoing leadership roles through which they could control messaging and updates to victims.

192.    As explained above, while the details of Defendants' scheme are uniquely in the possession and knowledge of Defendants and third parties, Plaintiffs have been able to uncover the facts alleged above from which to infer the fraudulent nature of their conduct. Indeed, Long Point created written materials to promote its use of ESOPs, touting the ability to limit the information that minority stockholders receive. As a result, not only do Defendants uniquely possess information about their relationships and communications with each other at pertinent

times, about their roles in the use of inflated valuations for the ESOP conversion, and about the timing and extent of defaults on covenants, but they also have purposely deprived Plaintiffs and those similarly situated to them of such information.

193.     Defendants made material misrepresentations and omissions to Plaintiffs and those similarly situated, including inflated valuations relied upon to establish a purchase price that enabled Long Point's affiliates to receive more than $40 million in cash and for Birdsey to receive the benefit of a $2.7 million payment for him, classified as an estimated tax payment, while making the notes to Plaintiffs and those similarly situated uncollectible.

194.     Birdsey and Starr caused similar misrepresentations to be made to SBS and Sears for the purchase of SBS.

195.     When providing information for valuations that informed pricing in a process on which Plaintiffs and others similarly situated relied, Defendants included, as described above, false information about contracts that did not actually exist, and omitted material information from what they disclosed to Plaintiffs and others similarly situated concerning their knowledge that highly-profitable business from SUNY Polytechnic Institute was no longer real or reliable. Defendants failed to disclose to Plaintiffs and those similarly situated material information about Stantec's interest in a strategic transaction that would have likely generated greater value for EYP's stockholders as a whole. Furthermore, Defendants failed to disclose to Plaintiffs and those similarly situated material information concerning Long Point's relationship with GreatBanc, as described above.

196.     Defendants made these material misrepresentations and omissions intentionally and with a reckless disregard for the truth, to induce Plaintiffs and those similarly situated to sell their stock and enter into the redemption, Group 1 and Group 2 notes at issue.

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 61 of 69

197.    As fiduciaries, the Defendants owed duties to disclose these material matters to Plaintiffs and others similarly situated. Instead, the Defendants engaged in self-dealing and concealed such matters.

198.    Plaintiffs and those similarly situated reasonably relied on the material misrepresentations and omissions by Defendants in agreeing to sell their stock to Defendants in exchange for worthless subordinated notes or, in the case of Plaintiff Sears and those similarly situated, to sell the assets of a highly profitable business, SBS, in exchange for worthless notes.

199.    None of the Plaintiffs could discover the fraud until one of them learned in September 2018 about Stantec's interest in purchasing EYP. The remainder of the Plaintiffs could not discover Defendants' fraud until restructuring and internal investigative efforts at EYP took place in early 2020. As described above, Defendants have fraudulently concealed and covered up their wrongdoing through recent false and misleading communications in 2020.

200.    As a direct and proximate cause of their reliance on Defendants' misrepresentations and omissions, Plaintiffs and those similarly situated lost the value of their EYP stock or the value of the assets of SBS, which can be measured by the principal and interest on their notes, and suffered other losses caused by Defendants' fraud, for which Defendants are liable.

201.    Defendants acted with a deliberate, reckless, and criminal indifference to the fundamental rights of Plaintiffs and those similarly situated. Such conduct could entitle Plaintiffs to an award of punitive damages.

### Count Three
(Conspiracy Against All Defendants)

202.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

203.    From in or about 2015 through the present, each of the Defendants knowingly and intentionally combined, conspired and agreed, with each other and others, to defraud Plaintiffs and those similarly situated, to breach fiduciary duties owed to them, to aid and abet breaches of fiduciary duty and to conceal and cover up their wrongdoing.

204.    As described in more detail above, each of the Defendants committed overt acts in furtherance of the conspiracy and reasonably foreseeable to each other, including by approving the ESOP transaction with disparate consideration diverted to Long Point and Birdsey.

205.    Defendants are directly and vicariously liable to Plaintiffs and those similarly situated for the damages directly and proximately caused by the wrongdoing of Defendants.

206.    Defendants acted with a deliberate, reckless, and criminal indifference to the fundamental rights of Plaintiffs and those similarly situated, thereby entitling Plaintiffs to an award of punitive damages.

**Count Four**
(Unjust Enrichment Against All Defendants)

207.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

208.    Each of the Defendants has been unjustly enriched at the expense of Plaintiffs and those similarly situated, beyond the scope of any contemplated contractual terms among them.

209.    It is against equity and good conscience to permit Defendants to retain what is sought to be recovered. Defendants have been unjustly enriched at the expense and exploitation of Plaintiffs and those similarly situated.

210.    Plaintiffs and those similarly situated are entitled to restitution or rescissory damages in connection with the ESOP scheme.

60

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 63 of 69

**Count Five**
(Constructive Fraudulent Conveyance Against Long Point Fund III,
Starr, Birdsey and GreatBanc)

211.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

212.    At the time of the implementation of Defendants' ESOP scheme, in or about June 2016, Defendants caused transfers of more than $43 million in cash, notes and other assets and property from EYP to Long Point, and approximately $2.7 million worth of cash and assets from EYP to and/or for the benefit of Birdsey, for no meaningful consideration to EYP.

213.    These conveyances to Long Point and Birdsey, in part through GreatBanc, rendered EYP insolvent such that it would be unable, if required, to pay its debt pursuant to the redemption, Group 1, or Group 2 notes.

214.    When controlling EYP's board of directors at the time of these conveyances, Long Point, Starr, and Birdsey knew and believed that EYP would incur debts beyond its ability to pay. This knowledge stemmed from, among other things, the fact that they knew the EYP valuation had included revenue not yet received from SUNY Polytechnic and business from SUNY Polytechnic that they knew was jeopardized because of the ongoing criminal investigation. Therefore, they knew that EYP would not be able to pay the majority (or possibility any) of the notes issued as part of the ESOP transaction.

215.    As the ESOP trustee with access to significantly lower valuations, GreatBanc knew and believed that EYP would incur debts beyond its ability to pay.

216.    Nonetheless, Defendants caused EYP to be transferred to the ESOP in exchange for significant cash payments, control of EYP, excessive compensation, and priority notes. GreatBanc aided and abetted fraudulent conveyances to Long Point and Birdsey, by knowingly

Case 1:23-cv-01437-AMN-DJS   Document 1-1   Filed 04/13/22   Page 64 of 69

accepting and actively participating in the use of the other Defendants' inflated valuation and thus substantially assisting in their breaches of fiduciary duties in order to stay in Long Point's good graces and ensure serving as the trustee for other ESOPs that Long Point created as part of its investment exit strategies.

217.    The transfers to Long Point and its affiliates, and for the benefit of Birdsey, frustrated and interfered with Plaintiffs' ability to collect on the notes that they hold.

218.    As creditors of EYP, which in turn is insolvent, Plaintiffs and those similarly situated are entitled to restitution of the conveyances for their benefit or damages in an equivalent amount.

### Count Six
(Intentional Fraudulent Conveyance Against Long Point Fund III, Birdsey and GreatBanc)

219.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

220.    At the time of the implementation of Defendants' ESOP scheme, in or about June 2016, Defendants caused transfers of approximately $44 million worth of assets and property from EYP to Long Point, and approximately $2.7 million worth of assets from EYP to or for the benefit of Birdsey, for no meaningful consideration to EYP.

221.    Long Point and Birdsey intended or recklessly disregarded the fact that EYP lacked prospects for any stockholder other than Long Point's affiliates being paid in substantial part for its stock. Birdsey also intentionally took the benefit of a $2.7 million payment at closing that was a unique benefit in connection with his efforts that helped Long Point's affiliates receive more than $40 million in cash.

222.    These conveyances to Long Point and Birdsey rendered EYP insolvent and left it with inadequate capital such that it would be unable to satisfy, as required, its debt pursuant to

Case 1:23-cv-01437-AMN-DJS   Document 1-1   Filed 04/13/22   Page 65 of 69

the redemption, Group 1, or Group 2 notes.

223.     When controlling EYP's board of directors at the time of these conveyances, Birdsey and Long Point knew and believed that EYP would incur debts beyond its ability to pay. Long Point, Starr, Birdsey and GreatBanc acted with intent to defraud EYP's present and future creditors. GreatBanc aided and abetted fraudulent conveyances to Long Point and Birdsey, by knowingly accepting and actively using the other Defendants' inflated valuation and thus substantially assisting in their breaches of fiduciary duties in order to stay in Long Point's good graces and ensure serving as the trustee for other ESOPs that Long Point created as part of its investment exit strategies.

224.     As creditors of EYP, which in turn is insolvent, Plaintiffs and those similarly situated are entitled to restitution of the conveyances for their benefit or damages in an equivalent amount.

## Count Seven
### (Reformation Subordinating Long Point, Starr, and Birdsey)

225.     Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

226.     Long Point, its affiliates, Starr, and Birdsey have engaged in fraud targeting Plaintiffs and others similarly situated, resulting in EYP being insolvent.

227.     Contrary to their fiduciary duties and positions of trust, Long Point and Birdsey have claimed a priority right over various categories of noteholders.

228.     At the time of Defendants' fraudulent ESOP scheme, in or around June 2016, Long Point, Starr, and Birdsey owed fiduciary duties to Plaintiffs and those similarly situated.

229.     Based on the fraud perpetrated by Long Point, its affiliates, Birdsey, and Starr, and/or Plaintiffs' unilateral mistakes caused by Long Point, its affiliates, Birdsey, and Starr about

63

Case 1:23-cv-01437-AMN-DJS    Document 1-1    Filed 04/13/22    Page 66 of 69

the value of EYP's stock in the transaction with the ESOP, equity and good conscience require a declaration of reformation of the parties' rights, subordinating the rights of Long Point, Starr, and Birdsey below those of all of the redemption, Group 1 and Group 2 noteholders.

**Count Eight**
(Constructive Trust Against Long Point, Long Point Fund II, Long Point Fund III, Starr, and Birdsey)

230.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

231.    Defendants Long Point, Long Point Fund II, Long Point Fund III, Starr, and Birdsey have held a confidential and fiduciary relationship in favor of Plaintiffs and others similarly situated.

232.    These Defendants made and caused to be made, promises about the value and existence of payments.

233.    Plaintiffs and others similarly situated transferred their stock in reliance on those promises.

234.    Defendants Long Point, Long Point Fund II, Long Point Fund III, Starr, and Birdsey have been unjustly enriched as a result.

235.    Based on their fraud committed in violation of their fiduciary duties owed to Plaintiffs and others similarly situated to Plaintiffs, Defendants Long Point, Long Point Fund II, Long Point Fund III, Starr, and Birdsey should be deemed to hold the funds they received in connection with the June 28, 2016 launch of and sale to the ESOP in a constructive trust for the benefit of Plaintiffs and those similarly situated.

**Count Nine**
(Fraudulent Inducement Against Birdsey)

236.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in

INDEX NO. 651555/2022
RECEIVED NYSCEF: 04/01/2022

full herein.

237.   Plaintiff Sears is one of six former equity owners of SBS. SBS was a highly respected architectural firm that specialized in healthcare, which was and continues to be one of the most if not the most profitable segment of EYP.

238.   SBS was incorporated under the laws of the State of Georgia and headquartered in Georgia.

239.   Birdsey had courted SBS for years in order to take advantage of SBS's expertise and high profitability.

240.   During the negotiations between EYP and SBS for EYP's purchase of certain of SBS's assets, Birdsey, both on his own and through EYP's consultant Modicum, concluded that SBS was worth $3 million and offered to purchase the company's assets for this amount. EYP offered to pay the SBS equity owners collectively approximately $75,000 in cash, $2.4 million in notes, and over $225,000 in purchase warrants—all to be split among Plaintiff Sears and the other five SBS equity owners.

241.   In order to induce Plaintiff Sears and the other five SBS equity owners to accept notes and warrants instead of cash, Birdsey, both on his own and through EYP's consultant Modicum, informed Plaintiff Sears and the other five SBS equity owners that EYP was valued at $170 million, a value sufficient to pay off the KeyBank loan along with interest and principal on all outstanding notes.

242.   Birdsey knew that EYP would not be able to purchase SBS's assets with $3 million in cash but that the purchase of SBS was necessary for EYP to increase its profitability and attempt to pay down some of its crippling debt. Therefore, Birdsey presented the inflated valuation to Plaintiff Sears and the other five SBS equity owners to induce them to

accept notes and warrants in lieu of cash.

243.    At that time, Birdsey knew that the valuation included revenue from projects related to SUNY Polytechnic that EYP would never receive in light of the investigation and subsequent indictment of Kaloyeros. Birdsey also knew that EYP would not meet its covenants with KeyBank and would not be able to pay any interest, let alone principal, on any notes and that the purchase warrants did not have an aggregate value anywhere near the approximately $225,000 Birdsey assured Plaintiff Sears and the SBS equity owners that they were worth.

244.    Plaintiff Sears and the other five equity owners of SBS relied on Birdsey's representations as to the value of EYP, the value of the notes, and the value of the warrants. If not for theses representations, Plaintiff Sears and the other five equity owners of SBS would not have sold SBS's assets to EYP.

245.    To date, Plaintiff Sears and the other equity owners of SBS have not received any interest or principal payments on their notes. When Plaintiff Sears retired, she was informed that the company's stock price was approximately one-quarter of the strike price of the warrants, and that the warrants would be rescinded.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1. That the Court certify the class and approve Plaintiffs as named representatives of the class, and the undersigned as lead counsel;

2. that the Court enter judgment in favor of Plaintiffs and those similarly situated on all claims set forth in its Complaint, awarding just and fair damages and monetary relief on Counts One through Four and Six, for the wrongdoing that Defendants inflicted upon them, and the declaratory and equitable relief requested on Counts Five, and through

Nine;

3. that the Court award to Plaintiffs their attorneys' fees, costs, expenses, and pre-judgment and post-judgment interest; and

4. that the Court award to Plaintiffs any and all further and other relief to which they may be entitled at law or in equity.

**Plaintiffs Demand a Trial by Jury on All Issues so Triable**

Dated:   April 1, 2022                          Respectfully submitted,

PLAINTIFFS KOHLBERG, EIJADI,
McDOUGALL, LASSOR, OTTAVIO,
JURKOWSKI, and STEINBOCK,

By their attorneys,

/s/Phillip Rakhunov
Barry S. Pollack
Phillip Rakhunov
POLLACK SOLOMON DUFFY LLP
485 Madison Avenue, Suite 1301
New York, NY 10022
212-493-3100 (Tel)
617-960-0490 (Fax)
prakhunov@psdfirm.com
bpollack@psdfirm.com

PLAINTIFF SEARS,

By her attorneys,

/s/Matthew C. Lenahan
Matthew C. Lenahan
RUPP BAASE PFALZGRAF
CUNNINGHAM, LLC
16 West Main Street
Rochester, NY  14614
585-381-3400 (Tel)
lenahan@ruppbaase.com

67