UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS MCDOUGALL, individually and as Trustee of the Thomas G. McDougall Trust dated November 17, 2005, PETER D. OTTAVIO, individually and as Trustee of the Peter D. Ottavio Revocable Living Trust dated February 19, 2016, MELISSA LASSOR, and JASON STEINBOCK, all on behalf of themselves and all others similarly situated,<br><br>                                        Plaintiffs,<br><br>    -against-<br><br><br>GREATBANC TRUST COMPANY,<br><br>                                        Defendant. | Index No. 1:22-cv-03079-ALC<br><br><u>**AMENDED CLASS ACTION COMPLAINT**</u> |

Plaintiffs Thomas McDougall, individually and as Trustee of the Thomas G. McDougall Trust dated November 17, 2005, Peter D. Ottavio, individually and as Trustee of The Peter D. Ottavio Revocable Living Trust dated February 19, 2016, Melissa Lassor, and Jason Steinbock, all on behalf of themselves and all others similarly situated, as and for their Complaint against Defendant GreatBanc Trust Company ("GreatBanc"), allege as follows:

**Preliminary Statement**

1.      At relevant times, EYP Inc., EYP Holdings, Inc., EYP Group Holdings and affiliates (collectively the "EYP Entities") engaged in the business of architecture and engineering services based out of the Albany, New York area, doing business as "EYP."

2.      Plaintiffs are former employees of EYP. On June 28, 2016, as part of related transactions conducted primarily in Albany, New York, each of the Plaintiffs relinquished equity interests in exchange for promissory notes, as described in more detail below.

3.      On or about June 28, 2016, the EYP Entities engaged in related transactions centered around operations in Albany, New York, in connection with launch of an Employee Stock Ownership Plan ("ESOP") for EYP. Through those transactions, Defendant GreatBanc fraudulently induced (1) Plaintiffs, and those similarly situated, into relinquishing all of the common stock each of them held in EYP Holdings, Inc., in exchange for certain subordinated notes made by EYP Group Holdings, Inc., known as either Group 1 Notes or Group 2 Notes, which were worth materially less than their face value; (2) EYP Group Holdings, Inc. into making and delivering approximately $103,994,567.03 in Group 1 and Group 2 promissory notes in exchange for the cancellation of all outstanding common stock in EYP Holdings, Inc.; (3) the EYP Entities into undertaking substantial operating debt in excess of $50 million from a bank based in the Albany, New York area to finance these transactions; and (4) EYP Inc. into transferring more than $43 million in cash through an ESOP to a controlling stockholder group of affiliates led by Long Point Capital, Inc. (collectively "Long Point Capital").

4.      As described in more detail below, GreatBanc knew that these and related June 28, 2016 transactions arose from a materially-inflated valuation of EYP's business, unduly leveraged the EYP Entities, allowed under the circumstances far too much cash out the door to Long Point Capital – without reasonable clawback rights – in breach of Long Point Capital's fiduciary duties as the controlling stockholder group, and caused EYP Group Holdings, Inc. to become immediately unable to service and pay the Group 1 and Group 2 notes as contemplated.

5.      GreatBanc's conduct with respect to the EYP Entities fits within a pattern of similar misconduct that resulted in regularly overpaying exiting controlling stockholders and at times bankrupting the ESOP sponsor companies or making them insolvent, including some such misconduct alongside the same controlling stockholder of the EYP Entities.

6.      Prior to June 28, 2016, Defendant GreatBanc engaged in a pattern of misconduct related to its work on ESOPs that subjected it to formal actions taken by the United States Department of Labor (the "DOL"), as described in detail below.

7.      In 2014, the DOL made GreatBanc a highly-publicized example of improper conduct by fiduciaries in connection with ESOPs. After public complaints about deceptive conduct by GreatBanc as an ESOP trustee, the DOL established and imposed written rules of conduct and duties on GreatBanc, along with millions of dollars in damages. Specifically, on June 2, 2014, the DOL obtained GreatBanc's undertakings to specific enumerated duties in an "Agreement Concerning Fiduciary Engagements and Process Requirements for Employer Stock Transactions" (the "GreatBanc Process Requirements Agreement"). Also on June 2, 2014, the Court in *Perez (Secretary of the US DOL) v. GreatBanc Trust Co.*, Case No. ED-CV12-1648, then-pending in the United States District Court for the Central District of California, entered an Order incorporating the terms of the GreatBanc Process Requirements Agreement (the "GreatBanc Duties Order").

8.      The GreatBanc Duties Order thereby imposed a detailed list of prospective undertakings and duties on GreatBanc when, among other things, structuring any ESOP as a contemplated trustee, including the following:

- a duty to critically assess the reasonableness of any projections (particularly management projections), and if the valuation report does not document in writing the reasonableness of such projections to the Trustee's satisfaction, the Trustee will prepare supplemental documentation explaining why and to what extent the projections are or are not reasonable;

- a duty to document in writing its bases for concluding that the information supplied to the valuation advisor, whether directly from the ESOP sponsor or otherwise, was current, complete, and accurate;

- a duty to analyze and document in writing whether the ESOP sponsor will be able to service the debt taken on in connection with the transaction (including the ability to service the debt in the event that the ESOP sponsor fails to meet the

projections relied upon in valuing the stock), and the financial impact of the proposed transaction on the ESOP sponsor, and document in writing the factors considered in such analysis and conclusions drawn therefrom; and

- a duty, when evaluating proposed stock transactions, to consider whether it is appropriate to request a claw-back arrangement or other purchase price adjustment(s) to protect against adverse consequences in the event of significant corporate events or changed circumstances, and to document in writing its consideration of the appropriateness of a claw-back or other purchase price adjustment(s).

9.     With respect to its work with the EYP Entities, GreatBanc recklessly and intentionally abandoned these duties under the GreatBanc Duties Order when structuring the stock transaction for the ESOP launch:

- despite its duty to critically assess the projections used for any valuation underlying pricing for the ESOP stock transactions, and its knowledge that the EYP Entities were losing what amounted to their most profitable business from SUNY Polytechnic Institute ("SUNY") because of a pending criminal investigation against the individual at SUNY who provided such business to the EYP Entities (as described in more detail below), GreatBanc allowed the use of a baseless assumption that such business had been or would be replaced when calculating projections and a valuation underlying the pricing for the ESOP;

- despite a duty to ensure and document the accuracy of information supplied to a valuation advisor, GreatBanc allowed the use of valuations in the pricing of the ESOP stock transactions that included disclaimers about the lack of reliability of the information, including one by its advisor that stated:

  o  In performing our analysis, we used various financial and other information provided to us by management or obtained from other private and public sources, and we have relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance therein with respect to the information. Furthermore, we take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company.

- despite a duty to analyze the EYP Entities' ability to service their debts and the financial impact of the transactions on the EYP Entities, GreatBanc recklessly and intentionally disregarded the obvious inability that the EYP Entities immediately had in servicing debt, including interest and soon thereafter principal obligations on notes to former equity holders and the EYP Entities'

near-immediate breaches of covenants on operating loans; and,

- despite duties to consider and seek clawback rights for cash payments made in the initial EYP stock transactions to a former controlling stockholder group, and GreatBanc's knowledge of a significant corporate development likely to cause material adverse consequences, namely the impending loss of the EYP Entities' most profitable business from SUNY, GreatBanc recklessly and intentionally failed to consider or seek such clawback rights.

10.      Simply put, GreatBanc knew based on conversations with, among others, EYP's CFO, that the EYP Entities experienced a materially adverse significant corporate development involving the loss of SUNY business because of a pending criminal investigation into the source of such business. GreatBanc also knew that the SUNY business was the or virtually the most profitable at the firm. Similarly, GreatBanc knew that the valuations, on which stock transactions for the ESOP were being priced, baselessly assumed the SUNY business would simply be replaced, thereby materially inflating the pricing of the stock, overleveraging the EYP Entities, and allowing Long Point Capital to depart with far too much cash without imposing any requisite clawback obligations. By facilitating this result, GreatBanc knowingly breached its duties and undertakings, including those set forth in the GreatBanc Duties Order and those that GreatBanc otherwise undertook in its activities in connection with the EYP ESOP.

11.      GreatBanc had directly pitched management of the EYP Entities in Albany, New York, before EYP Inc. signed a Trustee Engagement Agreement with GreatBanc dated December 23, 2015. During meetings, management of EYP, including EYP's CFO, questioned GreatBanc about the problems GreatBanc had with the DOL that led to the GreatBanc Duties Order the prior year. This topic was extremely important to certain management of EYP, including as representatives of minority stockholders such as Plaintiffs and those similarly situated, in connection with decisions to be made and recommendations to make to minority stockholders about the launch of an ESOP. Representatives of GreatBanc falsely assured and

represented to management in substance that its operations and methodologies fully complied with all the DOL requirements that had been imposed on GreatBanc, which if true would have protected all constituents involved in the launch of the ESOP by the EYP Entities.

12.    Consistent with these assurances and representations, in and in connection with the Investor Rights Agreement dated June 28, 2016, GreatBanc, including its Senior Vice President of ESOPs, Anne Umlauf, as a signatory to the Investor Rights Agreement, made materially false representations in substance that the execution, delivery and performance of stock and loan transactions with investors, such as Plaintiffs and those similarly situated, did not violate any provision of any law or order of any court or government agency, and would not cause any default under any agreement. In fact, GreatBanc knew that its conduct had been materially deficient and that the EYP Entities would be immediately in default of loan covenants and unable to satisfy contemplated payment obligations to noteholders.

13.    GreatBanc's statements, assurances and representations in this regard were materially false when made. GreatBanc made these statements intentionally and with a reckless disregard for the truth, to induce reliance by constituents of the EYP Entities for more than just the fees for structuring, launching, and overseeing the ESOP. GreatBanc engaged in this fraud to ingratiate itself further with a longtime partner in ESOP schemes, Long Point Capital, the leader of the outgoing controlling stockholder group, with a hope of future business. GreatBanc's fraud enabled the use of a materially-inflated valuation with which to price the stock transactions, which in turn facilitated the receipt by Long Point and its affiliates of more than $43 million in cash at the time of the ESOP launch, without any clawback obligations that had been contemplated in the GreatBanc Duties Order.

14.    The EYP Entities relied on the assurances and representations by GreatBanc when

recommending to Plaintiffs that they participate in the ESOP launch and exchange their common stock for Group 1 and Group 2 notes, and the Plaintiffs in turn relied on these recommendations that flowed from GreatBanc's representations and assurances. In so doing, the Plaintiffs and the EYP Entities reasonably relied on GreatBanc's representations and assurances when they participated in the closing of the ESOP launch on June 28, 2016.

15.    As a result of GreatBanc's fraud, the EYP Entities became immediately in breach of covenants on their operating loans and incapable of paying the Group 1 and Group 2 notes, as well as other notes known as redemption notes owed to former equity holders.

16.    On or about April 24, 2022, already long insolvent and facing more than $150 million in principal and interest obligations that they could never remotely pay in full, the EYP Entities filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

17.    Plaintiffs and those similarly situated have received significantly less than 20 cents on the dollar in principal and interest for their Group 1 and Group 2 notes. Had GreatBanc not engaged in fraud and instead fulfilled the DOL-imposed duties they undertook under the GreatBanc Duties Order and reaffirmed to management of the EYP Entities, (1) the former controlling stockholder would never have received more than a *pro rata* amount of cash, or would have been subject to a clawback of amounts above that, and (2) Plaintiffs would have received a multiple of the limited amount they recovered through the bankruptcy plan of reorganization approved by the Bankruptcy Court.

### Jurisdiction and Venue

18.    Based on the changes of parties in this case from the original Complaint, there is now complete diversity of citizenship over this action and more than $75,000 in dispute

exclusive of interest and costs. This Court has personal jurisdiction over GreatBanc.

19.    Venue in this District is based on removal of this case from the Supreme Court of the County of New York. Certain original defendants who were citizens of New York are no longer parties to this case. A substantial portion of the events giving rise to this action occurred in the Northern District of New York, where the EYP Entities are headquartered, many witnesses reside, and a related litigation is pending. Each of the causes of action herein arose from events that occurred substantially in and centered around Albany, New York.

## Parties

20.    Plaintiff Thomas McDougall is a citizen of Minnesota and a Trustee of the Thomas G. McDougall Trust dated November 17, 2005 (collectively "McDougall"). As a result of GreatBanc's ESOP scheme, McDougall received a Group 1 note dated June 28, 2016 in the amount of $5,870,735.98, plus interest.

21.    Plaintiff Peter D. Ottavio is a citizen of New York and a Trustee of the Peter D. Ottavio Revocable Living Trust dated February 19, 2016 (collectively "Ottavio"). As a result of GreatBanc's ESOP scheme, Ottavio received a Group 1 note dated June 28, 2016, in the amount of $4,790,584.37, plus interest.

22.    Plaintiff Melissa Lassor is a citizen of South Carolina. As a result of GreatBanc's ESOP scheme, Lassor received a Group 1 note dated June 28, 2016 in the amount of $1,615,667.30, plus interest.

23.    Plaintiff Jason Steinbock is a citizen of Iowa. As a result of GreatBanc's ESOP scheme, Steinbock received a Group 2 note dated June 28, 2016 in the amount of $951,172.96, plus interest, with a maturity date in or about 2051.

24.     Defendant GreatBanc is a juridical entity formed under the laws of Illinois with headquarters based in Illinois. GreatBanc engaged in substantial acts and omissions in the Albany, New York, area where the EYP Entities have been based at all relevant times and in connection with the events giving rise to the claims herein.

**Factual Background**

***EYP's Business and Acceptance of a Controlling Investment by Long Point Capital***

25.     Founded in 1972, at all relevant times, EYP provided architecture and engineering services based out of the Albany, New York, area.

26.     EYP grew at its peak to more than 600 employees.

27.     Prior to Long Point Capital's investment in 2011, EYP had been consistently ranked as one of the nation's top architecture and engineering firms. Just prior to the investment, EYP had been named fifteenth overall and second in the education sector on Engineering News Record's list of the Top 100 Green Design Firms. Long Point Capital viewed EYP as one of the world's leading architecture and engineering firms.

28.     On or about August 10, 2011, Long Point Capital closed and announced its investment in EYP. Long Point invested approximately $9 million in exchange for an approximately 30% interest in EYP and the right to appoint three of five members on the board of directors. As a result of the transaction, Long Point Capital appointed three of its partners and principals to the board of EYP, and thereby controlled the board of EYP.

***The 2015-2016 Architecture and Engineering Marketplace***

29.     In 2015 and 2016, the architecture and engineering industry was ripe for strategic transactions. For 2015, as an example, Morrissey Goodale tracked a record 234 sales of domestic architecture and engineering firms. This flurry of activity reflected a greater than 5% increase

over the flurry of 222 domestic deals completed in 2014. These transactions included AECOM's $6 billion acquisition of the engineering and design firm URS Corporation. In June of 2016 alone (when GreatBanc and Long Point Capital were consummating their ESOP scheme), the industry experienced significant merger activity. For example, MorrisSwitzer Environments for Health, Ascension Group Architects, and daSilva Architects merged into Environments for Health Architecture. Shortly thereafter, Mason & Hanger, the Day & Zimmermann Company in design, architecture and engineering solutions, acquired the architecture and engineering firm Hankins & Anderson. Later that year, EwingCole, the architecture, engineering, and interior design firm, acquired BBH Design, a planning, design, and design research services firm.

***Strategic Transaction Opportunities with Stantec Abandoned for the ESOP Scheme***

30.     By in or about February 2015, EYP engaged Houlihan Lokey ("Houlihan") as a financial advisor to analyze the potential sale of EYP. Houlihan expressed strong optimism about the climate for a transaction and EYP's candidacy as a target.

31.     Based on its experience in the industry, Houlihan stressed to EYP and Long Point Capital the availability and value of synergies in an exit transaction, recommending a build out of the synergy story.

32.     Houlihan provided expert guidance on EYP's unique appeal within its synergy story, including EYP's exceptional industry-wide recognition with a diverse customer and end-market base; an outstanding and sustainable financial profile with a highly-scalable platform; an industry thought leadership with unparalleled barriers to entry; and significant growth opportunities with a proven track record. Houlihan described the benefits and logistics of a sales process that would generate bidding activities among multiple suitors.

33.     By on or about February 12, 2015, Houlihan had identified a short list of potential

strategic suitors offering adequate synergies for an acquisition of EYP. This list included Stantec, a publicly-traded competitor, as a potential strategic suitor offering adequate synergies for an acquisition of EYP. Houlihan identified Stantec as having an equity-value to EBITDA ratio reflecting an 11.8x multiplier.

34.    EYP had regularly used a consultant named Terry Johnson of Modicum, LLC, for assistance with acquisitions. Johnson proceeded into discussions with Stantec about an acquisition of EYP. By in or about September 2015, Johnson had engaged in substantial discussions with Stantec's Vice President of Acquisitions and Strategic Planning.

35.    Also by late September 2015, Stantec offered an opportunity for EYP to enjoy greater value in a strategic acquisition with synergies, significantly beyond the value that an ESOP offered, particularly from the perspective of EYP's minority stockholders. Upon information and belief, Stantec made known that it was prepared to acquire EYP, which would have generated a value much greater for minority stockholders than what could be obtained through the ESOP scheme that GreatBanc ultimately implemented for its and Long Point Capital's own benefit.

36.    By in or about October 2015, Stantec sought to arrange for its President/CEO and Executive Vice President to meet with EYP's leadership.

37.    On or about October 22, 2015, Stantec made arrangements to meet with Johnson and management from EYP on November 10, 2015. Upon information and belief, Stantec was eager to complete an acquisition of EYP at fair market value that would take into consideration the synergies between the parties.

38.    EYP management canceled the November 10, 2015 meeting.

39.    By on or about November 17, 2015, in control of the board of the EYP Entities,

Long Point Capital caused EYP's management to seek affirmative commitments from senior management to the use of an ESOP to buy EYP.

40.    Despite Long Point Capital's duties to disclose as a controlling stockholder, and its appointed board members' duties to disclose as directors, each of them withheld from minority stockholders and other constituents the material existence of an alternative to an ESOP in the form of Stantec's developed interest in an acquisition of EYP and management's summary rejection of Stantec.

**GreatBanc's History with Long Point Capital and the DOL**

41.    Long Point Capital has held out its experience in creating ESOP exit transactions through the regular use of GreatBanc as an ESOP trustee.

42.    Prior to 2015, GreatBanc had developed a reputation for serving the interests of the private equity funds or controlling stockholders that bring it in as a trustee, rather than the interests of other constituents to whom it actually owed at least duties of honesty.

43.    In 2014, the DOL took significant action against GreatBanc.

44.    Shortly before Long Point Capital brought GreatBanc in as ESOP trustee at EYP, on June 2, 2014, the DOL reached a settlement agreement with GreatBanc imposing a long list of strict rules with which GreatBanc must comply whenever serving as an ESOP trustee. This document is entitled, "AGREEMENT CONCERNING FIDUCIARY ENGAGEMENTS AND PROCESS REQUIREMENTS FOR EMPLOYER STOCK TRANSACTIONS." The terms of this Agreement became incorporated by a federal court into the GreatBanc Duties Order.

45.    In addition, when imposing these terms, the DOL required GreatBanc to pay $5.25 million as damages for its wrongdoing at issue in the particular case giving rise to the GreatBanc Duties Order.

46.     These duties and undertakings imposed by the DOL on GreatBanc, incorporated into the federal court's GreatBanc Duties Order focused on, among other things, reliability of information used for a valuation in connection with any ESOP transaction, critical assessments of projections underlying valuations and stock pricing, fair stock pricing, the ability of the sponsor employer to service debt incurred in connection with the stock transactions that launch the ESOP, and the use of clawback arrangements to avoid overcompensation of an outgoing controlling stockholder group, along with reiteration of conflict-of-interest principles and extensive documentation and record-keeping requirements.

47.     Among other things, GreatBanc agreed in pertinent part that it would:

- prudently determine that its reliance on the valuation advisor's advice is reasonable before entering into any transaction in reliance on the advice;

- critically assess the reasonableness of any projections (particularly management projections), and if the valuation report does not document in writing the reasonableness of such projections to GreatBanc's satisfaction, it will prepare supplemental documentation explaining why and to what extent the projections are or are not reasonable;

- not cause an ESOP to purchase employer securities for more than their fair market value or sell employer securities for less than their fair market value. (The DOL states that the principal amount of the debt financing the transaction, irrespective of the interest rate, cannot exceed the securities' fair market value.)

- document in writing its bases for concluding that the information supplied to the valuation advisor, whether directly from the ESOP sponsor or otherwise, was current, complete, and accurate;

- analyze and document in writing whether the ESOP sponsor will be able to service the debt taken on in connection with the transaction (including the ability to service the debt in the event that the ESOP sponsor fails to meet the projections relied upon in valuing the stock), and the financial impact of the proposed transaction on the ESOP sponsor, and document in writing the factors considered in such analysis and conclusions drawn therefrom;

- not cause an ESOP to engage in a leveraged stock purchase transaction in which the principal amount of the debt financing the transaction exceeds the fair market value of the stock acquired with that debt, irrespective of the

interest rate or other terms of the debt used to finance the transaction; and

- consider whether it is appropriate to request a clawback arrangement or other purchase price adjustment(s) to protect the ESOP against the possibility of adverse consequences in the event of significant corporate events or changed circumstances and document in writing its consideration of the appropriateness of a claw-back or other purchase price adjustment(s).

***GreatBanc Undertakes Work for EYP***

48.     In the fall of 2015, one or more GreatBanc representatives traveled to Albany, New York, to present its services to EYP.

49.     Before entering into a Trustee Engagement Agreement dated December 23, 2015, with GreatBanc, and thereby agreeing to GreatBanc's role, management of the EYP Entities questioned GreatBanc about its past problems with the DOL. In or about early 2016, representatives of GreatBanc falsely assured management, including the CFO, in substance that GreatBanc's operations by then fully complied with all the DOL requirements and that GreatBanc continued to undertake all the duties that the DOL had imposed on it, which would protect all constituents involved in the launch of the ESOP by the EYP Entities.

50.     By in or about May 2016, GreatBanc had done most of its work on the valuation of EYP to establish the underlying price for the initial stock transactions.

51.     By that time, management had learned that SUNY and its CEO, Alain Kaloyeros, were targets of a criminal investigation into bid rigging. Ultimately, following a joint federal and state investigation, Kaloyeros was convicted of federal felonies.

52.     In or about May 2016, the CFO of EYP participated in discussions directly with GreatBanc and at least one of Long Point Capital's appointed directors in which the loss of future business from the highly-profitable SUNY client was discussed as a fact related to the valuation.

53.     Prior to that discussion, the leader of EYP's Science & Technology group had

included SUNY business in projections for use in GreatBanc's work. This business included, among other things, an enormously lucrative project involving SUNY and the New York Department of Health, for a $650 million construction of a building known as the Wadsworth Laboratory. For that project, EYP anticipated in excess of $43 million in fees, a particularly large amount within a highly-profitable anticipated pricing structure.

54.     Despite the obvious implications of the loss of the SUNY business, GreatBanc recklessly and deceptively facilitated the use of projections for the valuation on which stock pricing would be based and allowed it to be assumed, baselessly, unreasonably, and in a materially inaccurate way, that the SUNY business would be immediately and fully replaced with similarly profitable business. The SUNY business was lost, without prompt material replacement.

55.     GreatBanc recklessly and intentionally abandoned its duties under the GreatBanc Duties Order when structuring and implementing the ESOP for the EYP Entities.

56.     In connection with the ESOP scheme at EYP, GreatBanc materially violated these rules, duties and undertakings to which it had agreed with the DOL. Instead of fulfilling its duties and representations, GreatBanc took actions that benefitted itself and Long Point Capital to the unfair detriment of Plaintiffs, other similarly situated participants of the ESOP, and the EYP Entities.

57.     First, GreatBanc violated its duty to critically assess the reasonableness of projections used for any valuation underlying pricing for the ESOP stock transactions. GreatBanc knew from and recklessly disregarded discussions with management of the EYP Entities that EYP was losing business from SUNY that had been among its largest and most profitable because of a pending criminal investigation against the individual who provided such

business to EYP. Yet GreatBanc intentionally failed to question meaningfully and recklessly disregarded the use of a baseless assumption that such business had been fully replaced, which assumption was a pillar of the valuation underlying the pricing of stock transactions for the ESOP. For example, typically, professionals at EYP had been billed at up to approximately a 3.15-times multiplier of their labor cost, to allow reimbursement for overhead expenses and a reasonable profit. On the SUNY business, EYP had enjoyed approximately or greater-than a 5-times multiplier, making any assumption about fully replacing it utterly baseless and unreasonable.

58.     Second, GreatBanc violated its duty to determine and document that its reliance on valuation advisor's advice was reasonable. Specifically, GreatBanc intentionally relied on a report from its valuation advisor for pricing the ESOP stock transactions that disclaimed the reasonableness of inputs and the reliability of the information. GreatBanc recklessly disregarded the lack of an independent analysis as to whether the information that the valuation advisor was using was reasonable. The valuation advisor's disclaimer provided:

> In performing our analysis, we used various financial and other information provided to us by management or obtained from other private and public sources, and we have relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance therein with respect to the information. Furthermore, we take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company.

59.     Third, GreatBanc violated its duty to analyze the EYP Entities' ability to service their debts and the financial impact of the transactions on the EYP Entities, GreatBanc recklessly and intentionally disregarded the existing financial facts reflecting the immediate inability of the EYP Entities to timely service their debt, including interest and soon thereafter principal

obligations on notes to former equity holders and the EYP Entities' near-immediate breaches of covenants on operating loans.

60.    Fourth, GreatBanc violated its duty to consider and seek clawback rights for cash payments made in the initial EYP stock transactions to a former controlling stockholder group. By in or about May 2016, GreatBanc knew of a significant corporate development likely to cause material adverse consequences, namely the impending loss of EYP's most profitable business from SUNY, GreatBanc recklessly and intentionally failed to consider or seek such clawback rights from Long Point Capital and its affiliates. As a result, Long Point Capital and its affiliates departed from their role as a controlling stockholder group with a disparate form of consideration, namely all cash (and a disproportionate amount with respect to the actual equity sold), while minority stockholders received notes worth materially less than their face values, which the EYP Entities were never able to service.

61.    Beyond abandoning these duties, in large part to serve the interests of Long Point Capital, GreatBanc's lack of independence from Long Point Capital is evidenced by the fact that, according to a business record of Long Point Capital, GreatBanc improperly shared outside counsel, K&L Gates, for the implementation of the ESOP scheme for the EYP Entities. This conflict was not and could not reasonably have been perceived as prudent by GreatBanc and therefore ran afoul of the federal court's GreatBanc Duties Order. This joint representation deprived the ESOP and other participants in the transaction of certain unbiased legal advice and the attendant safeguards independent of Long Point Capital's interests.

62.    Rather than decrease the valuation of EYP and stock pricing because of the loss of the SUNY business, GreatBanc assumed annual increase and then departed upward from its valuation advisor's already-inflated valuation during negotiations of stock pricing with Long

Point Capital. As part of its scheme with Long Point Capital, GreatBanc agreed to purchase shares of EYP based on numbers closer to Long Point Capital's suggestion of an even more inflated stock price.

63.     Consistent with earlier assurances and representations to management of the EYP Entities, including in communications surrounding the execution of the Investor Rights Agreement dated June 28, 2016, GreatBanc, including its Senior Vice President of ESOPs, Anne Umlauf, as a signatory to the Investor Rights Agreement, made materially false representations to the EYP Entities, Plaintiffs, and others similarly situated to Plaintiffs. Specifically in the Investor Rights Agreement, Ms. Umlauf, as an officer of GreatBanc, represented in substance that the execution, delivery and performance of stock and loan transactions with investors (such as Plaintiffs and those similarly situated) did not violate any provision of any law or order of any court or government agency, and would not cause any default under any agreement. In fact, GreatBanc knew that its conduct had been grossly deficient under and violative of the GreatBanc Duties Order and that the EYP Entities would likely be immediately in default of loan covenants and contemplated payment obligations to noteholders.

64.     By virtue of these material misrepresentations at and before the closing of the ESOP launch, GreatBanc caused the EYP Entities to incur debt in excess of $150 million, encumbering substantial assets to do so, to lend $43 million to the ESOP on an unsecured basis to enable the ESOP to purchase stock held by affiliates of Long Point Capital for more than $43 million in cash.

65.     As a controlling stockholder governed by well-established Delaware law at that time, Long Point Capital's arrangement to receive through GreatBanc a disparate form of cash consideration, when minority stockholders received notes, violated fiduciary duties to the extent

it was not entirely fair in process, disclosure and pricing. As described herein, this arrangement by GreatBanc and Long Point Capital was unfair in process, disclosure and pricing, at least to the extent Long Point Capital received a share of the cash consideration beyond its *pro rata* ownership interest and without any clawback obligation.

66.     By knowingly borrowing this excessive amount of cash to fund a materially-inflated buyout of Long Point Capital's interest in EYP, GreatBanc facilitated an insider's windfall.

67.     Through these material misrepresentations at and before the closing of the ESOP launch, GreatBanc caused EYP Group Holdings, Inc. to issue more than $103 million in Group 1 and Group 2 notes in exchange for cancellation of common stock held by Plaintiffs and those similarly situated to them.

68.     By paying such an excessive amount of cash to Long Point Capital at the closing, at a price materially inflated above fair market value, the EYP Entities became overleveraged and incapable of servicing their operating debt without breaches of debt covenants and incapable of paying the contemplated principal and interest on the Group 1 and Group 2 notes that EYP Group Holdings, Inc. issued to former equity holders.

69.     Had GreatBanc acted honestly rather than fraudulently to serve the interests of a long-term partner, Long Point Capital, the transactions on June 28, 2016 would have limited the cash received by Long Point Capital to a *pro rata* share at a truly fair market value, along with the contemplated clawback rights to ensure that Long Point Capital did not receive the windfall that it did.

70.     GreatBanc's conduct with respect to EYP has been part of a common scheme and plan, and its regular way of doing business, to enrich itself through repeat relationships with

private equity funds and willingness to serve outgoing controlling ownership at the expense of other employees and minority stockholders. Here, GreatBanc's motives included a desire to further ingratiate itself with Long Point Capital to obtain future business.

71.    For example, upon information and belief, including public filings in an action brought against GreatBanc, as a trustee, GreatBanc caused an ESOP to pay on its launch, in or about 2015, more than $106 million for stock in Triad Manufacturing, Inc., actually worth less than $4 million.

72.    Upon information and belief, including public filings in an action brought against GreatBanc, as a trustee, GreatBanc caused an ESOP to pay on its launch, in or about 2008, approximately or more than $80 million for stock in People Care Holdings, Inc., actually worth less than $2 million, relying on overly-optimistic revenue projections that ignored the loss of a key contract.

73.    Likewise, upon information and belief, including public filings in an action brought against GreatBanc, as a trustee, GreatBanc caused an ESOP to pay on its launch, in or about 2011, an excessively-inflated value of more than $216 million for stock in Chemonics International, Inc., in violation of its fiduciary obligations.

74.    Despite Long Point Capital's duties to disclose as a controlling stockholder, and its appointed directors' duties to disclose unfair process, disclosures, and pricing underlying the ESOP, they falsely recommended the ESOP transactions as in the best interest of the EYP Entities and minority stockholders such as Plaintiffs and those similarly situated. Specifically, closing documentation for the ESOP reflected that Long Point Capital's appointed directors voted to approve the ESOP and to recommend that the EYP Entities and minority stockholders consummate the underlying transactions, even though they resulted unfairly in Long Point

Capital exploiting the EYP Entities and minority stockholders.

75.    GreatBanc knew that Long Point Capital made this false recommendation and withheld the materially unfair process, disclosures, and pricing underlying the ESOP transactions, as well as withheld the existence of Long Point Capital's and GreatBanc's financial interdependence and shared counsel, and GreatBanc's historic wrongdoing and willingness to exploit minority stockholders to benefit the private equity funds and other controlling stockholder groups, such as Long Point Capital and its affiliates, that retain them for service as an ESOP trustee.

76.    GreatBanc even caused the management of EYP to tout the reliability of GreatBanc to protect constituents from inflated valuations, including statements in substance that the trustee will not approve a valuation that it determines to create an unfair burden.

77.    By early 2017, management of EYP explained to Plaintiffs and those similarly situated that loan covenants and tests had not been satisfied for 2016, and therefore resulting payments on notes could not be made.

78.    The substance of the inflated valuations and stock pricing remained hidden from minority stockholders such as Plaintiffs and similarly situated noteholders until restructuring work at EYP in or about late 2019 and early 2020.

***The Noteholders' Notes***

79.    In 2016, EYP did not have sufficient cash to fund the ESOP's $43 million acquisition of Long Point Capital's EYP Stock. Therefore, the EYP Entities had to take out a substantial senior bank loan and impose on and recommend to minority stockholders a disparate form of consideration, namely subordinated notes in exchange for their stock shares.

80.    In connection with the ESOP scheme at EYP, Long Point Capital and GreatBanc

developed and facilitated the use of three categories of notes: (1) "redemption" notes for those already retired or retiring at the time, generally carrying a maturity date in or about December 2021; (2) "Group 1" notes for those existing employees planning to retire by approximately 2019, generally carrying a maturity date in 2051; and (3) further subordinated "Group 2" notes for then-existing employees who did not have imminent retirement plans, also carrying a maturity date of 2051.

81.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, McDougall received a Group 1 note dated June 28, 2016 in the amount of $5,870,735.98, plus interest.

82.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, Ottavio received a Group 1 note dated June 28, 2016, in the amount of $4,790,584.37, plus interest.

83.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, Lassor received a Group 1 note dated June 28, 2016 in the amount of $1,615,667.30, plus interest, as amended to confirm a five-year maturity date.

84.    As a direct and proximate result of the Defendants' ESOP scheme at EYP, Steinbock received a Group 2 note dated June 28, 2016 in the outstanding amount of $951,172.96, plus interest, with a maturity date of on or about June 28, 2051.

85.    GreatBanc's misconduct in connection with the ESOP caused the EYP Entities to fall out of compliance with bank covenants, default on the payment of interest on the Group 1 and Group 2 notes, and ultimately file for bankruptcy protection.

86.    On or about April 24, 2022, as a result of the insolvency created by GreatBanc's and Long Point Capital's joint activities on the ESOP transactions, the EYP Entities filed for

bankruptcy protection in the Bankruptcy Court.

87.     Prior to the bankruptcy proceedings, the Group 1 and Group 2 notes had been entirely uncollectible. As a result of the bankruptcy process, noteholders recovered less than 20 cents on the dollar for principal and interest on their notes. These limited payments for noteholders amount to little if anything more than interest on the notes. GreatBanc's misconduct is a substantial factor in the damage that ensued to the Plaintiffs, those similarly situated to Plaintiffs, and EYP Entities from the ESOP, while Long Point Capital received a windfall without clawback obligations.

88.     Under CPLR 205 and common law, a prior federal action tolled any applicable statute of limitations, from on or about August 7, 2020, through at least the filing of this action.

***Class Action Allegations***

89.     Plaintiffs bring this action on their own behalf and as a class action on behalf of all Group 1 noteholders and Group 2 noteholders who did not culpably participate in the disloyal creation and implementation of the Defendants' ESOP scheme at EYP (the "Class"). Upon information and belief, all such noteholders have held pertinent equity interests and then notes as a result of GreatBanc's fraud and at a time, from on or about November 10, 2015 through the present, when GreatBanc fraudulently induced the completion of the ESOP transactions.

90.     Upon information and belief, putative class members have received Group 1 or Group 2 notes in connection with the ESOP conversion on or about June 28, 2016.

91.     Excluded from the Class are Long Point Capital and its affiliates and any person, firm, trust, corporation, or other entity related to or affiliated with them, and any other noteholders who culpably participated in the development of the ESOP scheme.

92.    The Class Period covered by this class action is November 10, 2015 through the commencement of this action.

93.    This action is properly maintainable as a class action.

94.    The Class is sufficiently numerous that joinder of all members, whether otherwise required or permitted, is impracticable. There are likely more than 75 noteholders in the Class, but fewer than 100.

95.    In the alternative to a class of noteholders generally, the noteholders could be divided into sub-classes, according to the group to which they were assigned as noteholders.

96.    There are questions of law and fact that are common to the Class and which predominate over questions affecting only individual Class members. The common questions include, among other things, whether GreatBanc fraudulent induced the ESOP transaction based on materially-inflated valuations underlying stock pricing and without clawback rights against Long Point Capital and its affiliates.

97.    Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs do not have any interests adverse to the Class.

98.    Plaintiffs are adequate representatives of the Class, have been involved with EYP sufficiently to know its business, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

99.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for GreatBanc.

100.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

101.    GreatBanc has acted in a manner generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole. In a prior federal action, the Court approved the Plaintiffs as part of the "Lead Plaintiffs" before declining to exercise jurisdiction over state law claims.

**Count One**
(Fraud/Misrepresentation)

102.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

103.    The scheme to defraud at issue arose from a series of related transactions conducted in and centered around Albany, New York, where the EYP Entities based their business operations. The CFO and others at the EYP Entities communicated with GreatBanc, documented transactions, and facilitated financial aspects of the ESOP out of Albany, New York.

104.    In connection with these transactions, GreatBanc intentionally and recklessly breached duties and undertakings such as those set forth in the federal court's GreatBanc Duties Order, and made materially false written representations, on or about June 28, 2016, and other similar representations preceding the writing on that date, of full compliance with such law and orders of a court or government agency.

105.    GreatBanc's material misrepresentations also included the knowing and reckless use of a materially-inflated valuation and opinion by Stout about ESOP terms when setting the stock pricing for the launch of the ESOP. When setting materially-inflated stock pricing, GreatBanc knew that Long Point Capital's appointed directors would approve the ESOP terms

based on the inflated pricing and would recommend to the EYP Entities and minority stockholders that they consummate the underlying transactions, even though doing so facilitated Long Point Capital's exploitation of the EYP Entities and minority stockholders. At the very least, GreatBanc's use of the materially-inflated pricing created a duty to disclose to the EYP Entities the materially-flawed assumptions, in order to make the existing disclosures not materially misleading.

106.    GreatBanc intentionally induced reliance by the Plaintiffs directly through the Investor Rights Agreement and through management of the EYP Entities entrusting GreatBanc to serve as the check on Long Point Capital's efforts to derive a windfall from its exit strategy. Plaintiffs and the EYP Entities reasonably relied on GreatBanc's misrepresentations.

107.    GreatBanc's motive here included greed, in the form of fees it could generate by obtaining this work, and its interest in ongoing and future work with Long Point Capital.

108.    GreatBanc had a unique opportunity to defraud Plaintiffs and the EYP Entities because of its positioning as supposedly independent from the departing controlling stockholder group, Long Point Capital, and serving a role that should have been adverse to it during negotiations of stock pricing.

109.    GreatBanc made its material misrepresentations and omissions intentionally and with a reckless disregard for the truth, to induce Plaintiffs and those similarly situated, as well as the EYP Entities, to engage in the stock transactions that launched the ESOP and resulted in the issuance of Group 1 and Group 2 notes with a face value in excess of $103 million but worth far less than that amount and far less than Plaintiffs' *pro rata* share of the equity interests that they gave up in exchange.

110.    This scheme to defraud was self-concealing, and GreatBanc enabled itself and

26

Long Point Capital, through an appointed director, to hold ongoing leadership roles through which they could control messaging and updates to victims. In the years that followed the launch of the ESOP, GreatBanc and the EYP board, on which Long Point Capital had an appointed director, continued to mislead others, including members of management and the former minority stockholders about the reasons that notes were not being paid. This messaging claimed in substance falsely that the ESOP structure was helping and also claimed falsely that business developments had turned around, but that a little more time would be needed to meet operating loan covenants. In reality, the $43 million in cash that Long Point Capital took through GreatBanc, while saddling the EYP Entities with debt, had made the EYP Entities immediately or virtually immediately insolvent and immediately incapable of meeting contemplated obligations and covenants. Only after independent directors were brought in during the last quarter of 2019, did some of the truth begin to emerge in the second quarter of 2020.

111.    Given GreatBanc's superior knowledge about and experience in ESOPs, the terms of the GreatBanc Duties Order, and GreatBanc's assurances and representations about its compliance with court and DOL requirements, GreatBanc failed to comply with its duties to disclose the truth concerning those matters that GreatBanc misrepresented, and failed to provide adequate disclosures to make any partial disclosures not materially misleading.

112.    Plaintiffs and those similarly situated reasonably relied on the material misrepresentations and omissions by GreatBanc when participating in the ESOP launch and relinquishing their equity interests in exchange for Group 1 and Group 2 notes.

113.    As a direct and proximate cause of their reliance on GreatBanc's misrepresentations and omissions, Plaintiffs and those similarly situated lost the value of their EYP stock and suffered other losses for which GreatBanc is liable.

114.    GreatBanc acted deliberately, maliciously, and with a reckless indifference to the fundamental rights of Plaintiffs and those similarly situated, as well as to the EYP Entities. Such conduct could entitle Plaintiffs to an award of punitive damages.

115.    As described above, GreatBanc and Long Point Capital, including through its appointed director, fraudulently concealed their misconduct from Plaintiffs and those similarly situated until at least the spring of 2020.

### Count Two
(Conspiracy)

116.    Plaintiffs repeat and incorporate each of their prior allegations as if repeated in full herein.

117.    From no later than in or about December 2015 through the present, within and having direct adverse effects in Albany, New York, GreatBanc knowingly and intentionally combined, conspired and agreed with Long Point Capital, to defraud Plaintiffs and those similarly situated, as well as the EYP Entities, and to cause, aid and abet Long Point Capital's willful breach of fiduciary duties owed as a controlling stockholder, directly and through appointed directors, to Plaintiffs, those similarly situated, and the EYP Entities. These fiduciary duties included the duty to refrain from taking disparate forms of consideration in an exit transaction, such as all the cash, through unfair processes, disclosures and pricing such as what occurred here.

118.    Long Point Capital could not have accomplished its scheme to exploit the EYP Entities and the minority stockholders of EYP without GreatBanc's participation and willingness to facilitate use of a materially-inflated valuation and materially unfair stock pricing.

119.    As described in more detail above, GreatBanc and Long Point Capital committed overt acts in furtherance of the conspiracy and reasonably foreseeable to each other, including by

28

structuring and approving the ESOP transaction with disparate cash consideration diverted to
Long Point Capital that left the EYP Entities incapable of servicing its debts without breaches of
covenants, and incapable of making contemplated payments to Group 1 noteholders and Group 2
noteholders.

120.    As a co-conspirator, GreatBanc is directly and vicariously liable to Plaintiffs and
those similarly situated for the damages directly and proximately caused by the wrongdoing of
Long Point Capital and its affiliates.

121.    GreatBanc acted deliberately, maliciously, and with a reckless indifference to the
fundamental rights of Plaintiffs and those similarly situated, as well as to the EYP Entities,
thereby entitling Plaintiffs to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1. that the Court certify the class and approve Plaintiffs as named representatives of the
   class, and the undersigned as lead counsel;

2. that the Court enter judgment in favor of Plaintiffs and those similarly situated on all
   claims set forth in their Complaint, awarding just and fair damages and monetary relief
   on Counts One and Two, for the wrongdoing that Defendant GreatBanc inflicted upon
   them;

3. that the Court award to Plaintiffs their attorneys' fees, costs, expenses, and pre-judgment
   and post-judgment interest; and

4. that the Court award to Plaintiffs any and all further and other relief to which they may be
   entitled at law or in equity.

**Plaintiffs Demand a Trial by Jury on All Issues so Triable**

Dated:   February 17, 2023                    Respectfully submitted,

                                              PLAINTIFFS McDOUGALL, LASSOR,
                                              OTTAVIO, and STEINBOCK,

                                              By their attorneys,

                                              /s/Phillip Rakhunov
                                              Barry S. Pollack
                                              Phillip Rakhunov
                                              POLLACK SOLOMON DUFFY LLP
                                              43 W 43rd St #174
                                              New York, NY 10036
                                              212-493-3100 (Tel)
                                              prakhunov@psdfirm.com
                                              bpollack@psdfirm.com

## <u>Certificate of Service</u>

The undersigned certifies that this document will be electronically served on counsel who are registered users of ECF on February 17, 2023.

/s/Phillip Rakhunov